IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

## CLARK MATTHEW EARLS v. SHIRLEY ANN EARLS

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-98458     Russ Heldman, Judge**

**No. M1999-00035-COA-R3-CV - Decided May 31, 2000**

This appeal involves a marriage irretrievably broken by a catastrophic injury to the wife. The parties separated after attempting to cope with the wife's condition for over one year, and the husband filed for an irreconcilable differences divorce in the Circuit Court for Williamson County. The wife agreed that the parties had irreconcilable differences but resisted the divorce because she desired to continue being covered by the husband's employer-provided group medical insurance. The trial court heard the evidence without a jury and declined to grant the husband a divorce or to declare the parties divorced. The trial court also awarded custody of the child to the wife despite the parties' agreement and the lack of evidence that the wife was physically and psychologically able to shoulder the responsibilities of being the custodial parent. The husband has appealed. We have determined that the record contains ample evidence to declare these parties divorced in accordance with Tenn. Code Ann. § 36-4-129(b) (Supp. 1999). We have also determined that the evidence does not support the trial court's decision to award custody of the parties' child to the wife and that the trial court's award of spousal support to the wife should be modified.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part;**
**Modified in Part; and Remanded**

KOCH, J. delivered the opinion of the court in which COTTRELL, J. joined. COTTRELL, J. filed a concurring opinion. CAIN, J. filed a dissenting opinion.

Thomas F. Bloom and Robyn Ryan, Nashville, Tennessee, for the appellant, Clark Matthew Earls.

R. E. Lee Davies, Franklin, Tennessee, for the appellee, Shirley Ann Earls.

### OPINION

Clark Matthews Earls and Shirley Ann Holman Earls met when they were approximately twenty years old. Both worked, and Mr. Earls also boxed professionally. Their son was born in July 1991, and they were married two years later in July 1993. While Ms. Earls had been married

previously, this was Mr. Earls' first marriage. The parties returned to Williamson County in 1996 after Mr. Earls failed to establish himself as a boxer in Las Vegas. Following their return, Ms. Earls managed an apartment complex, and Mr. Earls held part-time jobs at Service Merchandise Company and United Parcel Service.

Ms. Earls suffered an unexpected and catastrophic injury in March 1997 when an aneurism near her spine burst. She was left a quadriplegic and faced a long, difficult period of rehabilitation to regain even partial use of her arms and legs and to provide even a minimal level of self-sufficiency. Mr. Earls took a leave of absence from work in order to help Ms. Earls with her rehabilitation. Mr. Earls' parents also moved to Middle Tennessee for eleven months to help their son, daughter-in-law, and grandson. When Ms. Earls was released from the rehabilitation center in June 1997, the parties moved to a mobile home in Wartrace because Ms. Earls wanted to be closer to her father. Mr. Earls agreed to move even though it significantly increased his commute to work.

The rehabilitation process was slow and difficult. For their own reasons, each party became discouraged and depressed. Mr. Earls was frustrated because he believed that Ms. Earls was not pursuing her rehabilitation as vigorously as she could, and Ms. Earls became depressed and angry about the cruel blow fate had dealt her. Unfortunately, each party became the target of the other's frustration and anger. Eventually, the pressure and strain drove the parties apart. They began to argue frequently and to call each other names. Eventually, the tension in the household became so intense that Mr. Earls' parents decided to move back to their home in Cleveland, Tennessee rather than endure the constant fighting between their son and daughter-in-law.

As time passed, the parties became less communicative and more distant. The constant pressure and tension extinguished their feelings for each other. From Ms. Earls' point of view, Mr. Earls kept providing her care, but he was only providing her "the basics, you know, here's your food; here's your water; here's your pill; here's things that you need." From Mr. Earls' point of view, Ms. Earls continued to be angry and resentful about her injury and stopped expressing any affection for him or appreciation for his efforts to assist her. As Mr. Earls described it, Ms. Earls was "very cold and bitter," and "all I could do is to be there for her."

Approximately fifteen months after Ms. Earls' injury, Mr. Earls told her that he had contacted a lawyer and that he wanted a divorce. Ms. Earls did not disagree that their relationship was irretrievably broken, and in early July 1998, she moved out of the handicapped accessible apartment where they had moved and went to live with her mother and step-father. The parties agreed to an irreconcilable differences divorce and, on July 16, 1998, signed a marital dissolution agreement. The agreement provided that the parties would have joint custody but that the child would live "primarily" with Mr. Earls. It also provided that Ms. Earls would not be required to pay child support because Mr. Earls was receiving the child's SSI payments stemming from Ms. Earls' medical condition.

Mr. Earls filed the irreconcilable differences divorce complaint on July 17, 1998. Ms. Earls informed him that she no longer agreed to the terms in the marital dissolution agreement, and on

August 5, 1998, she filed an answer and counterclaim. While she admitted that the parties had "irreconcilable differences" that were "permanent," she requested that the trial court declare the marital dissolution agreement void because it had been procured through undue influence and duress. She did not request a divorce of any sort, but she requested spousal support and a temporary restraining order preventing Mr. Earls from removing her from his employer-provided medical insurance and from concealing or dissipating marital assets. Mr. Earls denied the undue influence and duress claims, and on December 14, 1998, filed an amended complaint seeking a divorce on the ground of inappropriate marital conduct. Three days later, Ms. Earls denied the inappropriate marital conduct allegation and responded, in accordance with Tenn. Code Ann. § 36-4-120(a) (Supp. 1999), that any ill conduct on her part was caused by ill conduct on the part of Mr. Earls.

The first day of trial occurred on March 10, 1999. By this time, Ms. Earls was still not requesting a divorce of any sort but was requesting spousal support. Before the proof was taken, Ms. Earls informed the court that the parties had agreed that Mr. Earls should have custody of the child but also insisted that she should have the right to reopen the custody question whenever she thought that she was sufficiently rehabilitated to take care of her son. The trial court responded to this announcement by suggesting joint custody with Mr. Earls being the "residential parent." When both parties agreed to the suggestion, the trial court announced: "Then that would be the decree of the court with respect to the custody issue." With the custody issue seemingly resolved, neither party presented the evidence normally associated with custody disputes.

The trial reconvened on March 26, 1999, and the parties concluded presenting their evidence and argument by noon. After deliberating for approximately two hours, the trial court returned to the bench to deliver its ruling. First, the court announced that Mr. Earls had not proved by a preponderance of the evidence that Ms. Earls had engaged in "cruel and inhuman treatment."[1] The court also concluded that Ms. Earls' "right of privacy . . . estops this court from going so far as to finding any choice that she's made with respect to her body to be cruel and inhuman treatment towards Mr. Earls." Then, turning to the question of custody, the court awarded sole custody of the child to Ms. Earls because Mr. Earls' relationship with Laura Moore "jeopardized the child in a moral sense." The court ordered Mr. Earls to pay Ms. Earls $570 per month in spousal support until her death, $300 per month in child support, as well as all her accrued and future medical expenses not covered by insurance. Finally, the court permanently enjoined Mr. Earls from "coming around Laura Moore . . . to promote and protect the marriage relationship which exists and will exist in this case until I'm reversed or something new comes before the [c]ourt." On this appeal, Mr. Earls takes issue with the trial court's refusal to declare the parties divorced, its custody decision, its spousal and child support orders, and with the blanket injunction against associating with Ms. Moore as long as he was married.

---

[1]The trial court commented "No way José has she done that as far as I'm concerned."

# I.
## WHETHER THE PARTIES SHOULD BE DIVORCED

The trial court, perceiving itself as the protector of the institution of marriage,[2] declined to divorce the parties on two grounds. First, it concluded that Mr. Earls failed to carry his burden of proving the existence of one of the grounds for divorce in Tenn. Code Ann. § 36-4-101 (Supp. 1999). Second, the trial court concluded that the parties should not be divorced because Ms. Earls would "be more aggressive in pursuing reconciliation" once Mr. Earls' divorce complaint was dismissed. This reasoning demonstrates a fundamental misunderstanding of the divorce statutes and a fanciful interpretation of the evidence.

## A.

For at least one hundred and fifty years, the courts of this state have been empowered to grant divorces when a spouse engages in "cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper." Tenn. Code Ann. § 36-4-101(11); Code of Tennessee § 2449(1) (1858). The courts' view of the type of conduct that amounted to cruel and inhuman treatment has changed over the years. For a long time, the type of treatment that was considered cruel and inhuman enough to warrant a divorce consisted of "the willful, persistent causing of unnecessary suffering, whether in realization or apprehension, whether of body or mind, in such a way as to render cohabitation dangerous and unendurable." *Gardner v. Gardner*, 104 Tenn. 410, 412, 58 S.W. 342, 343 (1900) *overruled on other grounds*, *Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 335 (1948); *Russell v. Russell*, 3 Tenn. App. 232, 245 (1926).

The courts further limited the conduct that would support a divorce on the grounds of cruel and inhuman treatment by pointing out that "[m]ere acerbity of temper, occasional reproaches, rude

---

[2]Over a century ago, the courts believed that they were duty bound to uphold marriage as "the most sacred of domestic relations." *DeArmond v. DeArmond*, 92 Tenn. 40, 44, 20 S.W. 422, 423 (1892). This view has long since been replaced by the less moralistic and more human view that when a marriage is irretrievably broken, both society at large and the parties themselves have "no interest in perpetuating a status out of which no good can come and from which harm may result." *Lingner v. Lingner*, 165 Tenn. 525, 534, 56 S.W.2d 749, 752 (1933); *see also Hamm v. Hamm*, 30 Tenn. App. 122, 141-42, 204 S.W.2d 113, 121-22 (1947).

The trial court mistakenly believes that the General Assembly revived this outmoded notion in 1996 when it enacted Tenn. Code Ann. § 36-3-113 (1996). This statute was passed to shield Tennessee from being required to recognize same-gender marriages performed in other states. Accordingly, it extolls heterosexual marriage as the "fundamental building block of our society." It stops far short, however, of endorsing the notion that either individual or societal interests will be advanced by condemning two persons to loveless marital unions.

language by the husband toward the wife, and even threats of violence where none is attempted,[3] do not constitute ground[s] for divorce under our statutes." *Watson v. Watson*, 25 Tenn. App. 28, 34, 149 S.W.2d 953, 957 (1940). In those days, the courts required acts of "cold-blooded cruelty and barbarity, on the part of husbands toward dutiful and innocent wives"[4] in order to protect the institution of marriage from the complaints of a wife who "permits herself to become very unhappy and dissatisfied with her condition by magnifying the faults and indiscretions of her husband, brooding over imaginary wrongs, or indulging in a feeling of opposition to that authority and control which properly belongs to him, as head of the family." *Shell v. Shell*, 34 Tenn. at 722.

Those chauvinistic days have long since passed, and this court has marked their passing on at least two occasions. First, in 1988, the Eastern Section held that conduct no longer must be dangerous or unendurable to amount to cruel and inhuman treatment. In doing so, the court granted a husband a divorce from a suicidal wife because "any series of misconduct which makes continued cohabitation unacceptable is sufficient to meet the statutory requirement." *White v. White*, Carroll Eq. No. 3, 1988 WL 101253, at *1 (Tenn. Ct. App. Oct. 3, 1988) (No Tenn. R. App. P. 11 application filed). Four years later, after the General Assembly changed the "cruel and inhuman treatment" ground to "inappropriate marital conduct,"[5] the Western Section of this court, following *White v. White*, upheld a divorce granted to a husband who had cared for his spouse during a long illness. The court found that the wife's conduct during the illness was "unacceptable" and had caused the husband "mental anguish and distress." *Brown v. Brown*, No. 02A01-9108-CV-00168, 1992 WL 5243, at *3 (Tenn. Ct. App. Jan. 16, 1992) (No Tenn. R. App. P. 11 application filed).

The trial court in this case brushed *Brown v. Brown* aside because it did not agree with the rationale of the decision.[6] We choose to side with our colleagues. It is not the Court of Appeals but the trial court who misperceives Tennessee's current public policy regarding divorces based on the ground of inappropriate marital conduct. Upon proof of any ground for divorce in Tenn. Code Ann. § 36-4-101, including inappropriate marital conduct, the General Assembly has empowered the courts to "grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone." Tenn. Code Ann. § 36-4-129(b) (Supp. 1999). Accordingly, a Tennessee court should grant a

---

[3]Today, this sort of conduct would be considered to be domestic abuse. *See* Tenn. Code Ann. § 36-3-601(1) (Supp. 1999).

[4]*Shell v. Shell*, 34 Tenn. (2 Sneed) 716, 728-29 (1855).

[5]*See* Tenn. Code Ann. § 36-4-101(11).

[6]The trial court explained that "I do not agree with what the Court of Appeals said in that case, because what the Court of Appeals did without the sanction of the Tennessee Supreme Court changed what all the inappropriate marital conduct and/or cruel and inhuman treatment cases had said for years just to say that cohabiting is not acceptable. Any series of misconduct flies in the face of all the prior law."

divorce from the bonds of matrimony whenever there is evidence of continued misconduct by one or both spouses that makes continued cohabitation unacceptable.

**B.**

It remains to be decided whether Mr. Earls has proved by a preponderance of the evidence that between March 1997 and July 1998 either or both of the parties engaged in a repeated course of conduct that made continued cohabitation unacceptable. This inquiry is rendered less difficult because the parties have already decided for themselves – they have determined that cohabitation is no longer acceptable to them because they have been living apart since July 1998. The evidence in this case clearly demonstrates that both parties have engaged in conduct inappropriate in a marital relationship. Accordingly, the evidence overwhelmingly preponderates against the trial court's conclusions that "nothing that Ms. Earls did . . . caused the break-up of the marriage" and that Ms. Earls was "waiting for this lawsuit to go away" before pursuing a reconciliation more aggressively.

The divorce question does not hinge on the fact that Ms. Earls was catastrophically injured in March 1997. Everyone involved with this case recognizes that neither Ms. Earls nor Mr. Earls is responsible for this misfortune. It does not even hinge upon Ms. Earls' efforts to rehabilitate herself or the progress of her rehabilitation despite the emphasis these matters received in the trial court.[7] The decision regarding the existence of grounds for divorce depends upon the parties' conduct toward each other.

While Ms. Earls had no control over the fact that she was injured, she did have control over how she treated Mr. Earls. While it is understandable how she might be resentful and depressed about her condition, she could have refrained from taking her anger out on Mr. Earls or from throwing objects or from eventually becoming cold and bitter without expressions of affection or gratitude for his efforts. By the same token, Mr. Earls could have kept his frustration and anger in check. He too could have avoided the name-calling, the arguments, and the attitude that Ms. Earls

---

[7]Both parties testified at some length about Ms. Earls' rehabilitation. Initially, Ms. Earls insisted that she did everything her healthcare givers told her to do, but later she conceded that she stopped her rehabilitation program for a period of time, that she declined to use certain apparatuses, and that she did not perform her home exercises. Mr. Earls also testified that Ms. Earls did not aggressively pursue the self-help activities and devices available to her. The trial court eventually decided that it was "estopped" to consider these facts because to do so would infringe on Ms. Earls' right of privacy protected by the Constitution of Tennessee. While the trial court's constitutional analysis is flawed, its conclusion is correct. Even though considering this evidence does not have constitutional overtones, the progress of Ms. Earls' rehabilitation is irrelevant to the issue of grounds for divorce except with regard to the conduct it may have caused the parties to engage in. Thus, Ms. Earls did not engage in inappropriate marital conduct by not seeking to rehabilitate herself more aggressively. However, both parties' frustrations over her injury and rehabilitation may have caused either or both of them to act in ways that were not appropriate for married couples.

was not trying hard enough to rehabilitate herself. As time passed, the parties' rancor grew, and the confrontations and arguments became more than isolated and infrequent incidents. The parties' disagreements escalated to the point where Mr. Earls' parents moved back home because they were no longer able to tolerate the atmosphere in the Earls' house. Thereafter, the rate of the disintegration of the parties' relationship accelerated as the burden of Ms. Earls' medical condition grew heavier and their external support diminished.

By the time the case reached the courts, both Mr. Earls and Ms. Earls had conceded that their differences were irreconcilable. Ms. Earls resisted Mr. Earls' divorce and did not seek a divorce of her own, not out of affection for Mr. Earls, but because she desired to avoid losing the health insurance provided by Mr. Earls' employer. Mr. Earls' group medical benefits should not have played a role in determining whether the parties should be divorced. While the courts should take the parties' desires into consideration, *see Turner v. Bell*, 198 Tenn. 232, 249, 279 S.W.2d 71, 79 (1955); *Lingner v. Lingner*, 165 Tenn. at 534, 56 S.W.2d at 752; *Herchenroeder v. Herchenroeder*, 28 Tenn. App. 696, 701, 192 S.W.2d 847, 849 (1945), they must ultimately render a decision called for by the law and the facts. Under the facts of this case, Ms. Earls' concern regarding her future medical care should have been addressed in the division of the marital estate and in spousal support and should not have influenced the decision on whether to grant a divorce.

When the trial court heard this case in March 1999, the parties' relationship had disintegrated and their love and affection had been extinguished. They had been separated for ten months with no effort or intention to rekindle their relationship. These circumstances had not changed when their lawyers argued the case before this court. Accordingly, the trial court should have found that both parties engaged in an inappropriate course of conduct over many months that rendered continued cohabitation as husband and wife unacceptable. On remand, the trial court shall enter an order declaring the parties divorced in accordance with Tenn. Code Ann. § 36-4-129(b).[8]

## II.
### CHILD CUSTODY

The trial court initially acceded to the parties' agreed-upon joint custody arrangement with primary physical custody being awarded to Mr. Earls. However, the court changed its mind solely because it decided that the child was "jeopardized in the moral sense" because of Mr. Earls' relationship with Ms. Moore. Even taking into account the trial court's invocation of the parties' credibility, the totality of the evidence, considered objectively, indicates that the court has imbued

---

[8]The trial court was evidently piqued at the testimony that Mr. Earls spat at his wife on one occasion, that he had pressured her into signing the marital dissolution agreement, and that he had kissed Ms. Moore on the mouth. Accordingly, the trial court stated that it would grant the divorce to Ms. Earls had she been seeking one. We do not quibble with the trial court's conclusion that Mr. Earls' "fault" exceeds Ms. Earls' "fault." But even conceding this point, the trial court could still have declared the parties divorced under Tenn. Code Ann. § 36-4-129(b) because the record clearly demonstrates that both parties contributed to the eventual disintegration of their marriage.

this relationship with more significance than it deserves. Accordingly, we reverse the trial court's decision awarding custody to Ms. Earls.

## A.

Decisions involving custody and visitation are among the most important decisions in a divorce case. The courts must devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Adelsperger v. Adelsperger,* 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997). These decisions are not intended to reward or to punish parents, *see Turner v. Turner,* 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991), and, in fact, the interests of the parents are secondary to those of the children. *See Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn. 1986). The goal of these decisions is to promote the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *See Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn. 1983).

No hard and fast rules exist for determining which custody and visitation arrangement will best serve a child's needs. *See Taylor v. Taylor,* 849 S.W.2d 319, 327 (Tenn. 1993); *Dantzler v. Dantzler,* 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *See Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn. 1988); *Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983); *see also* Tenn. Code Ann. § 36-6-106 (1996).

The comparative fitness analysis is not intended to ascertain which parent has been perfect because perfection is as unattainable in parenting as it is in life's other activities. *See Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998). Courts understand that parents have their own unique virtues and vices. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Accordingly, Tennessee's courts do not expect parents to prove that they are exemplary or that the other parent is completely unfit. Instead, they carefully consider the conduct and circumstances of the parents to determine which of the available custodians is comparatively more fit to have permanent custody of the child. *See Julian v. Julian*, No. M1997-00236-COA-R3-CV, 2000 WL 348317, *6 (Tenn. Ct. App. Apr. 4, 2000) (No Tenn. R. App. P. 11 application filed).

Since stability is important to any child's well-being, the courts have emphasized the importance of continuity of placement in custody and visitation cases. *See Taylor v. Taylor,* 849 S.W.2d at 328; *Contreras v. Ward,* 831 S.W.2d 288, 290 (Tenn. Ct. App. 1991). Continuity, however, does not trump all other considerations. Depending on the facts, a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child.

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts

are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *See D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *See Nichols v. Nichols,* 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992).

**B.**

The parties had already determined for themselves where their child's best interests lay. They knew that Ms. Earls could not care for the child on her own, and so they agreed that they should have joint custody with Mr. Earls being the custodial parent. They also agreed upon liberal visitation for Ms. Earls. They understood that this arrangement would require Mr. Earls to obtain help because he was continuing to hold down two jobs. Mr. Earls received this assistance from his mother and from Ms. Moore, a woman introduced by a mutual acquaintance following the parties' separation. Ms. Moore worked as a waitress in a Steak 'N Shake restaurant and had a son the same age as the parties' son. Ms. Earls was aware that Ms. Moore was taking care of her son and apparently did not object.

Ms. Moore and Mr. Earls were candid about their relationship. They had a good deal in common in that they were both trying to raise children on their own. They both worked long hours and faced significant financial pressures. They decided that pooling their efforts would be mutually beneficial. Mr. Earls realized that Ms. Moore could help provide babysitting when he was working. Thus, when his mother could not assist him, Ms. Moore could come to his apartment when he left for work early in the morning and could oversee his son's morning routine before the child left for school.

These circumstances caused Mr. Earls and Ms. Moore to become close and to depend upon each other. They conceded that they had kissed on several occasions as Ms. Moore left the apartment.[9] Ms. Moore candidly stated that it "wasn't the right thing to be going on" and insisted that she had never been in Mr. Earls' bed and had never had sex with him. She also explained that their relationship would not advance further until after Mr. Earls was divorced. Ms. Moore disclosed that she had slept with her son on Mr. Earls' couch on several occasions when she had car trouble, but she insisted that she had not moved into Mr. Earls' apartment and that she did not keep any of her things there.

The trial court found Ms. Moore to be a "fairly credible and very honest" witness. Despite the absence of any other evidence in the record that Ms. Moore and her son had moved in with Mr. Earls, the trial court concluded that Ms. Moore was "living" with Mr. Earls. In the trial court's mind,

---

[9]This testimony prompted the trial court to comment: "Why do people that are not married to each other kiss each other? I don't understand that. But go ahead, if you want to take that position."

therefore, the relationship between Mr. Earls and Ms. Moore would have provided Ms. Earls with sufficient grounds for a divorce had she sought one.[10] The trial court also concluded that it provided a basis for disregarding the parties' agreed upon custody arrangement that it had already approved, and for entering the quite unprecedented order permanently enjoining Mr. Earls from coming around Ms. Moore as long as he is married.[11]

The record does not contain one scintilla of evidence that Mr. Earls' relationship with Ms. Moore, whatever in truth it might be, has or will have an adverse impact on the parties' child. Considering the record objectively, Mr. Earls' relationship with Ms. Moore, born out of necessity, simply does not reflect on his ability to be his son's custodial parent. There being no substantial and material evidence in the record to require the trial court to second-guess the parties' own custody and visitation arrangement, we hold that the court erred by not approving the custody arrangement originally proposed by the parties. Accordingly, on remand, the trial court shall enter an order granting the parties joint custody of their son with primary physical custody in Mr. Earls.[12] Should Ms. Earls desire to change this custody arrangement, she will have the burden of proving that a material change in her child's circumstances has occurred and that she is comparatively more fit than Mr. Earls to be the child's custodial parent.[13]

---

[10]The trial court stated: "As far as I judge what Ms. Moore had to say about y'all's relationship, [it] would give this court cause to grant her a divorce, that means Mrs. Earls, but she doesn't want one and I'm not going to grant a divorce for her. She hasn't asked for one, and she doesn't want one and the law doesn't require me to."

[11]The trial court stated: "As long as these people [the Earls] remain married it morally jeopardizes this child to be exposed to Ms. Moore overnight with Mr. Earls in what is clearly at least on the surface to be perceived at this point in time to be a romantic situation. That's not good for . . . [the child] to see that." Rather than simply addressing possible romantic overnight visits, the court barred Mr. Earls from all contact with Ms. Moore.

[12]Following the entry of the order, Mr. Earls, as the custodial parent, will be entitled to receive the SSI payments for his son resulting from Ms. Earls' disability.

[13]The trial court appears to have agreed with Ms. Earls' argument that she should be permitted to seek a modification in the custody arrangement whenever she decides that her physical condition has improved enough to enable her to take care of the parties' child. However, an improvement in Ms. Earls' condition is not, as a matter of law, a changed circumstance that will warrant reopening the issue of custody. Changed circumstances must involve the child's circumstances rather than those of the non-custodial parent. *See White v. White*, No. M1999-00005-COA-R3-CV, 1999 WL 1128840, at *3 (Tenn. Ct. App. Dec. 10, 1999) (No Tenn. R. App. P. 11 application filed); *McCain v. Grim*, No. 01A01-9711-CH-00634, 1999 WL 820216, at *2 (Tenn. Ct. App. Oct. 15, 1999) (No Tenn. R. App. P. 11 application filed); *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4-5 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed).

Even though the trial court declined to declare the parties' divorced, it ordered Mr. Earls to pay Ms. Earls, as spousal support, $570 per month until her death. The court also directed Mr. Earls to pay all of Ms. Earls' accumulated medical expenses not covered by insurance and to be responsible for all her future uncovered medical expenses. These obligations, combined with Mr. Earls' other court-ordered obligations, far exceed his income. Accordingly, after considering the factors in Tenn. Code Ann. § 36-5-101(d)(1) (Supp. 1999), we have determined that the trial court's spousal support order must be modified.

**A.**

There are no hard and fast rules for spousal support decisions. *See Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996); *Stone v. Stone*, 56 Tenn. App. 607, 615-16, 409 S.W.2d 388, 392-93 (1966). Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *See Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996); *Jones v. Jones*, 784 S.W.2d 349, 352 (Tenn. Ct. App. 1989). Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. *See Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994); *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986).

Tenn. Code Ann. § 36-5-101(d)(1) (Supp. 1999) reflects a preference for temporary, rehabilitative spousal support, as opposed to long-term support. *See Herrera v. Herrera*, 944 S.W.2d 379, 387 (Tenn. Ct. App. 1996); *Wilson v. Moore*, 929 S.W.2d 367, 375 (Tenn. Ct. App. 1996). The purpose of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient. *See Smith v. Smith*, 912 S.W.2d 155, 160 (Tenn. Ct. App. 1995); *Cranford v. Cranford*, 772 S.W.2d 48, 51 (Tenn. Ct. App. 1989). The purpose of long-term spousal support, on the other hand, is to provide support to a disadvantaged spouse who is unable to achieve some degree of self-sufficiency. *See Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997). The statutory preference for rehabilitative support does not entirely displace other forms of spousal support when the facts warrant long term or more open-ended support. *See Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Isbell v. Isbell*, 816 S.W.2d 735, 739 (Tenn. 1991).

Even though fault is a relevant consideration when setting spousal support, *see* Tenn. Code Ann. § 36-5-101(d)(1)(K), these decisions are not intended to be punitive. *See Duncan v. Duncan*, 686 S.W.2d 568, 571 (Tenn. Ct. App. 1984); *McClung v. McClung*, 29 Tenn. App. 580, 584, 198 S.W.2d 820, 822 (1946). The purpose of spousal support is to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce. *See Shackleford v. Shackleford*, 611 S.W.2d 598, 601 (Tenn. Ct. App. 1980). While divorced couples often lack sufficient income or assets to enable both of them to retain their pre-divorce standard of living, *see Brown v. Brown*, 913 S.W.2d at 169, the

obligor spouse may be able to provide some "closing in money" to enable the disadvantaged spouse to approach his or her former financial condition. *See Aaron v. Aaron*, 909 S.W.2d at 411.

Spousal support decisions hinge on the unique facts of the case and require a careful balancing of the factors in Tenn. Code Ann. § 36-5-101(d)(1). *See Hawkins v. Hawkins*, 883 S.W.2d 622, 625 (Tenn. Ct. App. 1994); *Loyd v. Loyd*, 860 S.W.2d 409, 412 (Tenn. Ct. App. 1993). In virtually every case, the two most important factors are the demonstrated need of the disadvantaged spouse and the obligor spouse's ability to pay. *See Varley v. Varley*, 934 S.W.2d 659, 668 (Tenn. Ct. App. 1996); *Crain v. Crain*, 925 S.W.2d at 234.

**B.**

We have here a marriage of relatively short duration. While the parties were wed, they made ends meet by holding down three jobs between them. Following Ms. Earls' illness and the parties' separation, their combined needs quickly outstripped the resources available to them. Support decisions are seldom easy, and they are certainly rendered more difficult when there are legitimate needs and insufficient resources.

Mr. Earls paid Ms. Earls $211 per month in temporary support prior to the divorce decree. At trial, Mr. Earls proposed to continue this support; while Ms. Earls suggested that she should be responsible for her accrued and future medical expenses and, in return, that Mr. Earls should pay her $570 per month. Not only did the trial court order Mr. Earls to pay $570 per month in spousal support, but it also required him to be responsible for Ms. Earls' future uncovered medical expenses plus $14,878 in accrued medical expenses.[14]

Beyond doubt Ms. Earls needs financial support. Her injury has left her completely disabled, and the prospects for significant rehabilitation are remote. Her monthly government disability checks in the amount of $648 are her only current source of income other than the assistance she receives from her mother and step-father. At the same time, Mr. Earls' net monthly income – approximately $1,640 – is modest. In light of our modification of the trial court's custody decision, Mr. Earls will be required to support himself and the parties's child on this income plus the $323 monthly SSI payments which must be used for the child.

We have determined that Mr. Earls should pay short-term spousal support. Based on the length of the marriage, Ms. Earls' needs, Mr. Earls' ability to pay, as well as the fact that he will assume primary responsibility for raising the parties' child, we have determined that Mr. Earls should pay Ms. Earls support in the amount of $450 per month from April 6, 1999 through March 31, 2006. Neither the amount nor duration of this support shall be modified or extended. We have also determined that Mr. Earls should continue to pay the $144 monthly premium for Ms. Earls' COBRA insurance coverage as long as it is available and that Mr. Earls shall receive a credit against

---

[14]The accrued expenses were being repaid in monthly installments of $650 over eighteen months.

his monthly support obligation for these payments as long as he makes them. Finally, we have determined that Mr. Earls should shoulder the responsibility for paying the balance of Ms. Earls' uncovered medical expenses that had accrued at the time of the trial not to exceed $10,578.[15] On remand, the trial court shall enter a support order consistent with this opinion. In addition to establishing Mr. Earls' spousal support obligation prospectively, the order shall give Mr. Earls credit for any spousal support payments made since April 6, 1999 that exceed the amount of the support established by this opinion.

## IV.
### THE AWARD OF ATTORNEY'S FEES

Mr. Earls also takes issue with the trial court's decision to require him to pay Ms. Earls an additional $4,000 to defray her legal expenses. He asserts that he is unable to pay these expenses. Ms. Earls responds that she has no assets from which she can pay these expenses and that her condition renders her unable to generate additional income. She also requests this court to order Mr. Earls to pay the legal expenses she has incurred as a result of this appeal.

In a divorce action, an award of attorney's fees is treated as additional spousal support. *See Smith v. Smith*, 912 S.W.2d 155, 161 (Tenn. Ct. App. 1995); *Gilliam v. Gilliam*, 776 S.W.2d 81, 96 (Tenn. Ct. App. 1988). The decision to award attorney's fees lies within the sound discretion of the trial judge, *see Aaron v. Aaron*, 909 S.W.2d at 411; *Brown v. Brown*, 913 S.W.2d at 170, and we will not interfere with the trial judge's decision unless the evidence preponderates against it. *See Batson v. Batson*, 769 S.W.2d 849, 862 (Tenn. Ct. App. 1988). A party is entitled to attorney's fees when he or she lacks sufficient funds to pay his or her legal expenses or would be required to deplete other assets to do so. *See Brown v. Brown*, 913 S.W.2d at 170; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).

The record leaves little room for doubt that Ms. Earls currently lacks the resources to pay her lawyer and that her future income from all sources will barely cover her necessities. It is equally clear that Mr. Earls has few existing assets and that his income is modest when measured against his future obligations. However, Mr. Earls' ability to earn income and to accumulate assets is far superior to Ms. Earls'. Accordingly, we have no basis to second-guess the trial court's decision to require Mr. Earls to pay Ms. Earls $4,000 for her legal expenses. However, we have determined that it would be appropriate to permit Mr. Earls, at his election, to pay this amount in a lump sum or in installments over two years from the date of the entry of the mandate in this case. We have also determined that Mr. Earls should not be required to pay the legal expenses Ms. Earls has incurred as a result of this appeal.

---

[15]These expenses amounted to $14,878 at the time of trial. In its final judgment, the trial court awarded Ms. Earls the $4,300 that had been paid into court and directed her to use these funds to reduce the amount of these unpaid expenses. We affirm the trial court's disposition of the funds paid into court. By applying these funds to the accrued medical expenses, Mr. Earls' liability of the accrued but unpaid medical expenses will be capped at $10,578.

# V.
## MR. EARLS' ASSOCIATION WITH MS. MOORE

One final issue requires discussion. In light of the evidence regarding Mr. Earls' relationship with Ms. Moore, the trial court permanently enjoined Mr. Earls from "coming around" Ms. Moore as long as he is married. The trial court's explanation for this astonishing decision is that it did not believe it "to be in the best interest of this marriage for you Mr. Earls to continue this relationship with Ms. Moore." As the court saw it, the injunction would "promote and protect the marriage relationship which exists and will exist in this case until I am reversed or something new comes before the court." At Mr. Earls' request, we stayed this order while this appeal was pending.

Courts may appropriately consider a custodial parent's non-marital sexual activities in the context of a custody decision. *See Lance v. Lance*, No. 01A01-9801-CV-00036, 1998 WL 748283, at *3 (Tenn. Ct. App. Oct. 28, 1998) (No Tenn. R. App. P. 11 application filed); *Barnhill v. Barnhill*, 826 S.W.2d at 453. However, we have repeatedly pointed out that cohabitation alone does not necessarily provide grounds for changing custody when there is no proof that it has or will adversely affect the children. *See Varley v. Varley*, 934 S.W.2d at 666-67; *Sutherland v. Sutherland*, 831 S.W.2d 283, 286 (Tenn. Ct. App. 1991).[16] In order to shield young, impressionable children from these sorts of activities, the courts frequently enjoin the parents from engaging in intimate sexual activities while the children are present. The trial court's injunction in this case, however, far exceeds the customary remedies for non-marital sexual conduct.

No party on appeal has undertaken to defend this portion of the final order. We are not surprised because the order marks the first time that a trial court has enjoined a party from associating with another person even when the children are not present. The order cannot stand for three reasons. First, the record contains absolutely no proof that Mr. Earls' relationship with Ms. Moore, whatever it is, has adversely affected or is likely to adversely affect the parties' child. Second, the order infringes on Mr. Earls' constitutionally protected right to associate with persons of his own choosing. Third, the rationale for the injunction – the trial court's notion that the parties would reunite if Ms. Moore was out of the picture – is no longer relevant because we have directed the trial court, on remand, to enter an order declaring the parties divorced. Thus, as a matter of law, there is no longer a marriage to be preserved. Accordingly, the trial court's injunction preventing Mr. Earls from associating with Ms. Moore while he is married is dissolved.

---

[16]*See also Williams v. Williams*, No. 01A01-9610-CV-00468, 1997 WL 272458, at *6-7 (Tenn. Ct. App. May 23, 1997) (No Tenn. R. App. P. 11 application filed); *Salimbene v. Salimbene*, No. 87-194-II, 1987 WL 27748, at *1 (Tenn. Ct. App. Dec. 16, 1987) (No Tenn. R. App. P. 11 application filed); *Smith v. Smith*, No. 86-43-II, 1986 WL 7621, at *2 (Tenn. Ct. App. July 9, 1986) (No Tenn. R. App. P. 11 application filed) (reversing a decision to remove two children from the custody of a mother who admitted to having sexual relations with four different men during the first three years following the divorce).

## VI.

In summary, we reverse the portions of the April 6, 1999 final judgment in which the trial court (1) declined to divorce the parties, (2) awarded custody of the parties' child to Ms. Earls and ordered Mr. Earls to pay child support, (3) directed Mr. Earls to pay $570 per month in permanent alimony, and (4) ordered Mr. Earls to refrain from associating with Ms. Moore. We remand the case to the trial court with directions to enter an order consistent with this opinion (1) declaring the parties divorced in accordance with Tenn. Code Ann. § 36-4-129(b), (2) awarding the parties joint custody of their child with Mr. Earls receiving primary physical custody, and (3) directing Mr. Earls to pay Ms. Earls $450 in spousal support in accordance with Section III of this opinion. We tax the costs in equal proportions to Clark Matthew Earls and his surety and to Shirley Ann Earls for which execution, if necessary, may issue.