# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 9, 2002 Session

## MICHAEL WAYNE HOLEMAN v. DONNA RENE HOLEMAN

**Appeal from the General Sessions Court for White County**
**No. CV 2491     Steven C. Douglas, Judge**

---

### No. M2001-00622-COA-R3-CV - Filed October 24, 2002

---

After the trial court granted the parties a divorce, awarded them joint custody of their minor child, and granted primary physical custody of Child to Mother for the school year, Father filed a motion to reconsider the custody arrangement. The trial court denied the motion and Father appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and DON R. ASH, SP. J., joined.

Henry D. Fincher, Cookeville, Tennessee, for the appellant, Michael Wayne Holeman.

Allison M. Barker, Crossville, Tennessee, for the appellee, Donna Rene Holeman.

### OPINION

#### I. Facts

Michael Wayne Holeman ("Father") and Donna Rene Holeman ("Mother") were married on January 17, 1991, and lived in White County throughout their marriage. One child ("Child") was born during the marriage on July 25, 1992.[1] The parties separated in June of 1999, about one month prior to Child's seventh (7th) birthday.

Father filed a complaint on June 18, 1999, seeking a divorce on the grounds of adultery, irreconcilable differences, and inappropriate marital conduct. Father also sought custody of Child. Mother answered and counterclaimed.

---

[1] Mother's daughter from a previous marriage also lived with Mother and Father during their marriage, but her living arrangements are not at issue in the present custody dispute.

After the separation, Father moved in with his parents, a teacher and a semi-retired insurance agent, in a three bedroom home located in White County. Mother and Child continued to reside in the marital home in White County after the separation. Mother and Father did not get along well, and there were a number of disagreements, arguments, instances of name calling and cursing, and two of these incidents resulted in Mother seeking a protective order, and after the last she sought an assault warrant against Father. Father asserts these actions by Mother were frivolous and taken to gain some advantage in this litigation.

Mother is a registered nurse, and after the parties' separation she began working for Dr. Flint. She and her doctor employer began a romantic relationship four or five months before the divorce hearing and she testified at the hearing that they intended to get married. After the altercation between Mother and Father in October, 2000, Mother and Child moved into the Putnam County home of Dr. Flint.

The trial of the matter started on September 27, 2000, but was continued after the original judge recused himself. Ultimately, the trial was held on December 1, 2000. At trial, the parties each offered evidence attempting to show that his or her home was the best location for the custodial placement of Child. The trial court heard testimony from Mother and Father as well as: (1) Doug Downs, minister of the Cumberland Heights Church and licensed guidance counselor in Tennessee, who testified regarding his relationship with Mother and Father and his observations of Child's relationship with each parent; (2) Child's second grade teacher, whose classroom was next to that of Father's mother, who testified that although both parents were involved in Child's education, Father volunteered more in the classroom than Mother; (3) two nurses that worked with Mother, who testified that she was a good parent; (4) Father's parents, who testified that while either parent was fit to raise the child, Father was the better parent in their opinion; and (5) Mother's mother, who testified that in her opinion Mother was the better parent.[2]

The trial court granted a divorce to Father on the grounds of adultery committed by the Mother,[3] approved the division of the marital property as stipulated by the parties, and awarded joint custody of Child to the parties and split primary residential custody based on the school year, stating in its final order:

> The Court finds that it is in the best interests of the minor child that the parties be entitled to joint custody of the parties' minor child, . . . . [Wife] shall have primary physical custody over [Child] during the school year, conditioned upon her not residing out of wedlock with Dr. Flint, or any other member of the opposite sex that

[2]Father filed a motion asking the trial court to allow Child, eight years old at the time, to testify during the hearing. The trial court denied the motion, determining that it was not in the best interests of Child to testify at the hearing.

[3]Adultery as a ground for the divorce was not disputed. Mother conceded adultery with Dr. Flint, although she asserted that that relationship began well after Mother and Father were separated and after divorce proceedings were instituted.

is not a member of her family. [Father] shall be entitled to primary physical custody of [Child] during the summer months. Neither party shall have overnight guests of the opposite sex in the presence of the minor child.

The court went on to award visitation to Father every Wednesday night (to allow Child to attend Church), Friday evening until Sunday evening on the first weekend of the month, and Saturday noon until Sunday noon on the second, third, and fifth weekend of each month during the school year as well as all in-service days. Mother was awarded the same visitation while the child resided with Father during the summer. The trial court awarded each parent two weeks of uninterrupted visitation in the summer and divided holidays.

In findings from the bench at the close of the trial, approximately two months before the final order was entered, the court awarded Father a divorce on the stipulated ground of adultery. In addition, the court found,

I am going to award joint custody to the parents. I am going to give the mom primary physical custody, conditioned on her moving back to her parents residence, or another residence of her choice, unless, she and the doctor should choose to marry. But. She will not be allowed to be living at the doctor's home without the benefit of marriage. . . . You will move out ma'am, until such time as you get married.

Apparently taking the trial court's admonition to heart, Mother and Dr. Flint were married on December 15, 2000. After the entry of the trial court's final order on January 30, 2001, Father filed a motion to reconsider the trial court's ruling based on Mother's intervening bigamous marriage on December 15, 2000. Father argued in his motion to reconsider that Mother's marriage to Dr. Flint was bigamous because she was not divorced from Father until the court entered its final order and that this was another example of Mother flaunting the law and putting her wishes above the interests of Child. The trial court considered the motion on January 29, 2001 and after hearing arguments, denied the motion and determined that Father:

has failed to prove facts sufficient to support a change in the minor child's residential schedule from the schedule announced by this court on December 1, 2000, and set forth in the Final Decree . . . .

Father filed a timely notice of appeal, presenting the following issues for our review: (1) whether the trial court erred in finding that primary physical custody of Child should be with Mother; (2) whether the trial court erred in refusing to allow Child to testify on the issue of his custodial

preference;[4] and (3) whether the trial court erred by failing to change its final ruling despite Mother's remarriage on December 15, 2000.

## II. Standards for Custody Arrangements

In a suit for divorce, courts are authorized to award the care, custody, and control of any minor children to either parent, to both parents in a joint or shared custody arrangement, or to some other suitable person, as the welfare and interest of the children require. Tenn. Code Ann. § 36-6-101(a)(1). In making custody decisions, courts have "the widest discretion to order a custody arrangement that is in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2). A court's determination regarding custody must be made upon the basis of the best interest of the child. Tenn. Code Ann. § 36-6-106(a).

Thus, by statute as well as case law, the welfare and best interest of the children are the paramount concern in custody determinations, and the goal of any custody decision is to place the child in an environment that will best serve his needs. *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986); *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). The General Assembly has found that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann. § 36-6-401(a). The aim of a custodial arrangement is to promote the child's welfare by creating an environment that promotes a nurturing relationship with each parent. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996). Both the legislature and the courts have recognized the importance of stability and consistency in a child's life and, therefore, in child custody arrangements. Tenn. Code Ann. § 36-6-401(a)(1); *Aaby*, 924 S.W.2d at 627.

Where, as here, both parents seek custody, the child's best interest is to be determined by using an analysis of the comparative fitness of each parent in light of the particular circumstances of the case. *Parker*, 986 S.W.2d at 562 (citing *In re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995)); *Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. Ct. App. 1996); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1983); *Bah v. Bah*, 668 S.W.2d 663, 665-66 (Tenn. Ct. App. 1983). The comparative fitness analysis recognizes that no parent, as no person, is perfect, that each parent has strengths and weaknesses, and that each may contribute differently to the child's development. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Gaskill*, 936 S.W.2d at 630. Custody decisions are not intended to either reward or punish parents. *Earls*, 42 S.W.3d at 885; *Gaskill*, 936 S.W.2d at 630.

---

[4] Father argues that the trial court abused its discretion in its refusal to allow Child to testify. Tenn. Code Ann. § 36-6-107(7) places the decision of whether to hear the preference of a minor child regarding custody within the trial court's discretion. *See also Gilliam v. Gilliam*, 776 S.W.2d 81, 88 (Tenn. Ct. App. 1988) (explaining that "the trial court has wide discretion in determining whether it should take the testimony of a minor child, and once this decision has been made his discretion will be reviewed only for gross abuse"); *Hall v. Hall*, 489 S.W.2d 37 (Tenn. Ct. App. 1972). The record herein reflects no abuse of discretion by the trial court in this regard.

In the case before us, the trial court awarded both parents joint custody. While in sole custody arrangements the custodial parent has the sole and exclusive prerogative to make major life decisions regarding the child, *Rust v. Rust*, 864 S.W.2d 52, 55 (Tenn. Ct. App. 1993), joint custody arrangements necessarily imply a "sharing of parental responsibility for decisions regarding care, abode, education, health, and other matters of general welfare of the child." *Shepherd v. Metcalf*, 794 S.W.2d 348, 351 (Tenn. 1990); *Hoefler v. Hoefler*, No. M1998-00966-COA-R3-CV, 2001 Tenn. App. LEXIS 225, at * 7 (Tenn. Ct. App. Apr. 5, 2001) (no Tenn. R. App. P. 11 application filed).

Even though a joint custody arrangement is ordered, it is still necessary for the court to determine where the child will reside. That decision is customarily made by determining which parent will have primary physical custody and by determining the amount of visitation the other parent will have. Under the legislature's new terminology, the courts determine a residential schedule, which designates the primary residential parent and designates in which parent's home the child will reside on given days during the year. Tenn. Code Ann. § 36-6-402(5). In the case before us, the trial court essentially determined that the child would reside with his mother during the school year and with his father during the summer. Each parent was given liberal visitation during the time the child was residing with the other parent.

Thus, the trial court awarded joint custody, divided primary residential custody based on the school year, and gave liberal visitation to the non-residential parent. The trial court made several general statements from the bench prior to announcing the rulings orally, stating in part:

> The testimony basically showed that these two parties do not have a good relationship with each other. There was not much testimony directed to either one of them as being unfit parents. It is clear to the Court that both of these parties love [Child]. And. Care for [Child]. And. Want what is best for [Child]. It is not possible for me to put him in both of your homes, full time. . . .

Father's objection is to the determination that child's best interests were served by residing primarily with Mother during the school year, thereby giving Mother "the majority" of residential placement. Before the trial court, Father took the position that primary residential custody during the week should remain with one parent during the school year, and he does not take a different position on appeal. He asks that he be given primary custody of Child.

### III. Best Interests and Comparative Fitness

The determination of the children's best interest must turn on the particular facts of each case. *Akins v. Akins*, 805 S.W.2d 377, 378 (Tenn. Ct. App. 1990) (citing *Holloway v. Bradley*, 190 Tenn. 565, 570-72, 230 S.W.2d 1003, 1006 (1950)). "There are literally thousands of things that must be taken into consideration in the lives of young children, and these factors must be reviewed on a comparative approach." *Bah,* 668 S.W.2d at 666. When called upon to order a custody

arrangement, a court must consider many factors, some of which are set out in statute,[5] and some of which have been developed through case law.[6]

Because the determination of where a child's best interest lies is the result of the consideration of a number of factors in the context of a specific factual situation, *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997), it is particularly fact-driven. *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). Trial courts must exercise broad discretion in child custody matters. *Parker,* 986 S.W.2d at 563. Such decisions often hinge on the trial court's assessment of the demeanor and credibility of the parents and other witnesses. *Adelsperger*, 970 S.W.2d at 485. Consequently, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Rutherford*

---

[5] Tenn. Code Ann. § 36-6-106 (Supp. 1999) states:

In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

[6]*See Parker*, 986 S.W.2d at 562 (listing factors to be considered).

*v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (quoting *Gaskill*, 936 S.W.2d at 631). Accordingly, this court will decline to disturb the custody decision of the trial court herein unless that decision is based on a material error of law or the evidence preponderates against it. *Adelsperger*, 970 S.W.2d at 485.

We have reviewed the evidence presented in this case. Our first observation is that the evidence fully supports the court's comment that the parents do not have a good relationship with each other. After their separation, Mother and Father had a number of disputes which degenerated into name calling and worse. The parties differed on their recollections and interpretations of these interactions. Mother sought protective orders twice, which were dismissed. She took out an assault warrant against Father, and asserts it was Father's behavior during the incident leading to the warrant which convinced her to leave the marital home and move in with the doctor because she was frightened. Suffice it to say that neither parent was a particularly good role model for Child in their dealings with each other. The record also supports the trial court's finding regarding each parent's love and care for their son. Neither parent was shown to be unfit.

The testimony at trial revealed that both parents were fit, although both parties acknowledged making parenting decisions that may not have been in the best interest of Child. The testimony further established that Child had a strong relationship with his half-sister who resided with Mother, and that Mother had done nothing to discourage Child's relationship with his paternal grandparents. Although the parents disagreed and presented conflicting evidence regarding each's involvement in Child's education, including who signed more homework, the trial court resolved these differences. Each was shown to be involved in Child's education. At the time of trial, Child had been living primarily with Mother during the school week and was doing well in school. Child had been attending the same school where his paternal grandmother taught, and the trial court ordered that Child remain in that school. The evidence showed that Father was more active in Child's religious upbringing. Father's father was a church elder, and Father had become active in church and in Child's church activities. The trial court's custody and visitation arrangement accommodated Child's church activities.

Father argues that Mother abused legal processes to gain an advantage over Father in the divorce and custody dispute. The trial court heard testimony on these issues and was able to judge the credibility of the witnesses. Although the trial court made no specific finding of fact regarding the protective orders and assault warrant, we can infer that the trial court determined that, whatever the real circumstances, they did not weigh in favor of or against either party.

Father also argues that Mother interfered with his telephone visitation with Child and otherwise acted to undermine Father's relationship with Child. Again, the parties' interpretations of various incidents differ, but the evidence establishes that both parents made derogatory remarks about and to the other in the presence of Child. The trial court made no specific finding of fact regarding either parent's ability to encourage a good relationship between Child and the other parent. We infer that the trial court found that, comparatively, neither parent was considerably better or considerably worse than the other in this regard.

Father's final argument comes down to his assertions that Mother is less fit than he is because of her relationship with Dr. Flint, which began after the parties' separation. A parent's sexual infidelity does not disqualify that parent from receiving custody of his or her child. *Varley v. Varley*, 934 S.W.2d 659, 666-67 (Tenn. Ct. App. 1996). When such activities, however, involve neglect of or other harm to the child, such adverse impact on the child is a valid consideration in determining the child's best interest. *Id.*; *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. Ct. App. 1989). In the case before us, Mother not only became involved in an affair with another man while the divorce proceedings were pending, she chose to move in with her paramour, taking Child with her, after the initial date for the hearing which was postponed, but before the final hearing. Although we do not condone Mother's decision, that situation does not *per se* require a determination that Father is comparatively more fit than Mother to provide Child with the care he needs. There is no evidence in the record that Child was harmed by these temporary living arrangements. *See In re Parsons*, 914 S.W.2d 889 (Tenn. Ct. App. 1995). Mother's relationship with Dr. Flint, and more particularly its effect on Child's welfare, is one of the many factors the trial court may consider in determining comparative fitness and the child's best interests. *Nelson*, 66 S.W.3d at 902; *Varley*, 934 S.W.2d at 666-67.

The trial court heard testimony from both Mother and Father, as well as a host of other witnesses and fashioned a custody arrangement designed to serve Child's best interest. The trial judge is in a far better position than this court to observe the demeanor of the witnesses and resolve the issues in the case that are based on the truthfulness of the witnesses. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Lee v. Lee*, 66 S.W.3d 837, 851 (Tenn. Ct. App. 2001) (rehearing denied Oct. 29, 2001); *Whitacker v. Whitacker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

Trial courts necessarily have broad discretion to fashion custody and visitation arrangements in light of the unique circumstances of each case. A trial court's determination on those issues should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). The evidence herein does not preponderate against the trial court's determination that Child's best interests were furthered by an award of joint custody, division of primary residential custody on the basis of the school year, designation of Mother as primary residential custodian for the school year, and the award of liberal visitation.

## IV. Motion to Alter or Amend

Father sought an amendment of the court's final order, asking the court the award primary custody to him because Mother had, prior to the entry of the final order herein, married Dr. Flint. Father argued this marriage was bigamous[7] and, consequently, showed Mother's disregard for the

---

[7]This court has not been asked to rule on the issue of whether Mother's marriage to Dr. Flint was valid and, according to the record, neither was the trial court. We note, however, that entry of a judgment is generally necessary

(continued...)

law and resulted in continuation of the living arrangement prohibited by the court. The trial court declined to amend the custody arrangement previously ordered. We affirm that decision. The trial court could have concluded that Mother's marriage resulted from her desire to comply with that court's earlier order rather than a disregard for legal processes. In any event, nothing in the record leads to the conclusion that Mother's marriage harmed or affected Child as opposed to the alternative of moving elsewhere with Mother.

## V. Conclusion

After a thorough review of the record, we affirm the trial court's judgment fashioning an appropriate custody arrangement. The costs of the appeal are taxed to Father, Michael Wayne Holeman, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[7](...continued)
before it becomes effective, Tenn. R. Civ. P. 58.02, unless the court otherwise directs. In some circumstances, divorces have been determined to be effective before entry of the final decree, or the deficiency has been remedied. *Vessels v. Vessels*, 530 S.W.2d 71 (Tenn. 1975); *McCown v. Quillin*, 48 Tenn. App. 162, 344 S.W.2d 576 (1960); *Daniel v. Daniel*, No. 02A01-9606-CH-00135, 1998 Tenn. App. LEXIS 106 (Tenn. Ct. App. Feb. 12, 1998) (no Tenn. R. App. P. 11 application filed); *Miller v. Prentice-Miller*, No. 01-A-01-9505-CH-00225, 1995 Tenn. App. LEXIS 711 (Tenn. Ct. App. Nov. 1, 1995) (no Tenn. R. App. P. 11 application filed).