# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 8, 2002 Session

## TRACEY L. (YANUSZ) TAYLOR v. JOHN J. YANUSZ

**Appeal from the Sumner County General Sessions Court**
**No. 2743-G     C.L. Rogers, Judge**

---

**No. M2001-02760-COA-R3-CV - Filed June 27, 2002**

---

This appeal involves a dispute over the custody of a five-year-old boy. His parents were divorced following his mother's extramarital affair. Their marital dissolution agreement established a joint custody arrangement with the father having primary physical custody. Following an unsuccessful two-year reconciliation effort, the child's mother petitioned the Sumner County General Sessions Court for sole custody. The father insisted that the child's circumstances had not changed and that he continued to be more fit than the mother to be the child's primary custodian. The trial court, sitting without a jury, determined that the child's circumstances had changed and that the child's interests would be best served by placing him in his mother's custody. The father asserts on this appeal that the child's circumstances have not changed materially and that the evidence does not support giving sole custody to the mother. While we have determined that the child's circumstances changed following his parents' divorce, we have determined that the evidence preponderates against the trial court's conclusion that the changes are so escalating and dangerous that they required a change in the original custody arrangement. Accordingly, we vacate the order awarding the mother sole custody of the child and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Vacated**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and ROBERT E. CORLEW, III, SP. J., joined.

Gary M. Williams, Hendersonville, Tennessee, for the appellant, John J. Yanusz.

Curtis M. Lincoln, Hendersonville, Tennessee, for the appellee, Tracey L. (Yanusz) Taylor.

## OPINION

### I.

Tracey L. Taylor, a dental hygienist, married John J. Yanusz, an automobile mechanic. Their son was born in June 1997. Sometime in 1998, Mr. Yanusz discovered that Ms. Taylor was having an extramarital affair with Jim Beam, one of his co-workers. Both parties retained lawyers, and Mr. Yanusz filed for divorce. Mr. Yanusz's lawyer eventually drafted a marital dissolution agreement which was presented to Ms. Taylor. Ms. Taylor signed the agreement on July 17, 1998, knowing

full well that it established a joint custody arrangement with Mr. Yanusz as the primary physical custodian.[1] The Sumner County General Sessions Court[2] entered a final decree of divorce on November 6, 1998, granting Mr. Yanusz a divorce and adopting the parties' marital dissolution agreement that gave Mr. Yanusz primary physical custody of their child and directed Ms. Taylor to pay $500 per month in child support.

Mr. Yanusz and the parties' son continued to live in the marital residence following the divorce. Despite the divorce, Mr. Yanusz and Ms. Taylor continued their sexual intimacy. Eventually, in February 1999, Mr. Yanusz reluctantly agreed to Ms. Taylor's request that they attempt a reconciliation. Ms. Taylor moved back in with Mr. Yanusz and the parties' son in late February 1999. It soon became evident that the reconciliation would not be long-term.

Mr. Yanusz was struggling to get over Ms. Taylor's adultery. In addition to working through his understandable interior emotional tug-of-war, Mr. Yanusz was required to continue working at the same automobile dealership where Mr. Beam worked. Also complicating matters was Mr. Yanusz's impression that Ms. Taylor was doing little to regain his trust. The parties had several loud, boisterous encounters that were punctuated by shoving, door-slamming, name-calling, and other dramatic histrionics.[3] Their son may even have witnessed one or more of these encounters. Mr. Yanusz also began to question Ms. Taylor's periodic evening office meetings at various restaurants and bars.

In an effort to resolve the pressure on their reconciliation efforts, Mr. Yanusz, with Ms. Taylor's concurrence, stopped working to avoid daily interaction with Mr. Beam. He anticipated that he would be able to earn money by performing mechanic work at home and that he could be a stay-at-home dad. This arrangement was short-lived. Six months later, after the expected mechanic work did not materialize, and the money began to get short, Mr. Yanusz returned to work at another automobile dealership. By some unfortunate happenstance, Mr. Beam began working at the same dealership shortly thereafter.

The parties' final confrontation occurred in March 1991 after Mr. Yanusz discovered that Ms. Taylor had an undisclosed email account and that she had been searching the Internet for information regarding "Enrique Gonzales," a Miami dentist whom she had met at a conference in Atlanta.[4] He also discovered that Ms. Taylor had been searching for flight schedules and hotel rooms in Miami.

---

[1] Ms. Taylor later testified that she did not ask her lawyer to review the draft marital dissolution agreement and that she misunderstood the import of granting Mr. Yanusz primary physical custody. She claimed that her lawyer told her that joint custody meant only that the primary custodial parent would pay the bills.

[2] Division II of the Sumner County General Sessions Court has concurrent jurisdiction with the circuit and chancery courts over "domestic matters." Act of Mar. 10, 1982, ch. 236, § 3, 1982 Tenn. Priv. Acts 89, 89-90, *amended by* Act of May 11, 1989, ch. 93, § 2, 1989 Tenn. Priv. Acts 186, 186-87.

[3] Ms. Taylor recounted that Mr. Yanusz threatened to kill her. Mr. Yanusz testified that "[p]robably both of us, in heated arguments, has probably said, boy, I'll kill you."

[4] Ms. Taylor initially claimed not to know "Enrique Gonzales." At trial, she conceded that she knew "Rick Gonzales" and that his first name was "Ricardo," not "Enrique."

When he telephoned Ms. Taylor at work about this discovery, she said that she had been looking up the information for a friend. Mr. Yanusz was convinced that Ms. Taylor was about to commit adultery again. Later in the day, he and the parties' son[5] went to the dentist's office where Ms. Taylor worked. The parties had a heated discussion both in the office and outside the office. Finally, Mr. Yanusz informed Ms. Taylor that he and the parties' son were moving out of the house and would be moving in with his parents who lived in Hendersonville.

Mr. Yanusz's departure with the parties' child prompted Ms. Taylor to file a petition in the Sumner County General Sessions Court for change of custody and a motion for visitation. Mr. Yanusz responded by denying that there was any basis for changing the custody arrangement established in the 1998 marital dissolution agreement and by requesting an increase in child support based on the increase in Ms. Taylor's income. The trial court granted standard visitation rights to Ms. Taylor pending the hearing on the parties' requests for relief.

Mr. Yanusz's lawyer deposed Ms. Taylor on August 9, 2001. When asked why she believed she should be the primary caretaker for the parties' son, Ms. Taylor explained (1) that she was "more financially stable" because she was salaried while Mr. Yanusz was paid on commission, (2) that Mr. Yanusz was "wishy-washy" because he changes his mind rather frequently and (3) that Mr. Yanusz was "getting less patient" and was having "mood swings." When asked to explain how Mr. Yanusz's mood swings manifested themselves, Ms. Taylor explained that "[h]e will just go from one extreme to the other in any given situation. He would call me when I was at a dinner meeting, office meeting, and threaten me and call me names." When asked at the end of the deposition if she had recounted all the reasons why she was more fit to have custody of the parties' child, Ms. Taylor responded that she had already mentioned everything.

At the trial approximately two weeks later, Ms. Taylor's account of life with Mr. Yanusz was much more dramatic than it had been during her deposition. On direct examination, she revealed for the first time that during the two-year reconciliation, Mr. Yanusz (1) began to exhibit a violent temper, (2) "put his fist through a door" on two occasions, (3) hit her "pretty hard" on the back of the head during an argument, (4) swore at her, (5) threatened repeatedly to kill her, (6) threatened to commit suicide, (7) became "vengeful and sneaky about doing things," (8) refused to "nurture" the parties' son on one occasion, and (9) had been voluntarily unemployed for up to six months. When asked on cross-examination why she had overlooked these matters during her deposition, Ms. Taylor responded that she "didn't realize that I needed to say all of that" and that she "didn't realize that's what you were after."[6] Despite her dramatic accounts of Mr. Yanusz's conduct during the

---

[5] Mr. Yanusz explained that he took his son with him because he was not working that day and had made no other arrangements for day care.

[6] The following is an example of an exchange between Ms. Taylor and Mr. Yanusz's lawyer:

Q:  You don't think it's bad for a father to call a mother a bitch in the presence of a child?
A:  I think it's terrible.
Q:  Why didn't you tell me that?
A:  Because I am bringing it up now.

(continued...)

-3-

reconciliation, Ms. Taylor denied that she was a "battered woman," admitted that her testimony was based on "just a couple of incidents," and agreed that Mr. Yanusz "appears to be a great father" and that he was a "pretty decent" stay-at-home dad. She also agreed that there had been no further incidents of any sort following the parties' separation in March 2001.

Based on Ms. Taylor's testimony, the trial court concluded that there had been "material changes in circumstances" since the parties' divorce, that Mr. Yanusz "has become extremely violent, threatening suicide, threatening death to the mother, and numerous verbal and physical assaults on the mother, several of such occasions having been shown to have occurred in the presence of the minor child," and that "the father's extreme jealousy results in uncontrolled outburst and anger." Accordingly, the court concluded that "these escalating, dangerous material changes in circumstances and conditions" warranted awarding sole custody of the parties' son to Ms. Taylor. The trial court also ordered Mr. Yanusz to "undergo anger management counseling with notice of completion of such course being filed with the Court within 180 days."

## II.

Custody and visitation decisions are among the most important decisions that courts make. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997). Their chief purpose is to promote the child's welfare by creating an environment that promotes a nurturing relationship with both parents. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996).

Each parent has his or her own strengths and weaknesses, *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996), and it would be unrealistic to measure each parent against the standard of perfection. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Bush v. Bush*, 684 S.W.2d 89, 93 (Tenn. Ct. App. 1984). Therefore, custody decisions are not intended to reward parents for prior virtuous conduct or to punish them for their human frailties or past missteps. *Earls v. Earls*, 42 S.W.3d at 885; *Gaskill v. Gaskill*, 936 S.W.2d at 630. Rather, taking the parents as they presently are, the courts must pragmatically decide whether the parents, even though divorced, will be able to share the responsibilities for raising their child or, if not, which of the two parents is comparatively more fit to take on the primary parenting role.

Children thrive in stable environments. *Aaby v. Strange*, 924 S.W.2d at 627; *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4-5 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed); National Interdisciplinary Colloquium on Child Custody, *Legal and Mental Health Perspectives on Child Custody Law: A Deskbook for Judges* § 5:1, at 51 (1998). Accordingly, the courts favor existing custody arrangements. *Taylor v. Taylor*, 849 S.W.2d 319, 332 (Tenn. 1993); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). In fact, a custody decision, once made and implemented, is considered res judicata upon the facts in existence or reasonably foreseeable when the decision was made. *Young v. Smith*, 193 Tenn. 480,

[6](...continued)

Q:     I know, the day of the hearing.

A:     Well, Mr. Yanusz should have told you the way he's been acting.

485, 246 S.W.2d 93, 95 (1952); *Steen v. Steen*, 61 S.W.3d at 327; *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998).

Despite a preference for continuing existing custody arrangements, the courts have recognized that the circumstances of children and their parents change. Accordingly, our statutes and decisions empower the courts to alter custody arrangements when intervening circumstances require modifications. Tenn. Code Ann. § 36-6-101(a)(1) (2001). Thus, courts may modify an existing custody arrangement when required by unanticipated facts or subsequently emerging conditions. *Smith v. Haase*, 521 S.W.2d 49, 50 (Tenn. 1975); *Adelsperger v. Adelsperger*, 970 S.W.2d at 485. In the interests of stability in the child's life, a court should not alter an existing custody arrangement until (1) it is satisfied that the child's circumstances have changed in a material way since the entry of the presently operative custody decree, (2) it has carefully compared the current fitness of the parents to be the child's custodian, and (3) it has concluded that changing the existing custody arrangement is in the child's best interests. *Gorski v. Ragains*, 1999 WL 511451, at *3.

There are no bright line rules for determining when a change of circumstances should be deemed material enough to warrant changing an existing custody arrangement. *Taylor v. Taylor*, 849 S.W.2d at 327; *Solima v. Solima*, 7 S.W.3d at 32. These decisions turn on the unique facts of each case. As a general matter, however, the following principles illuminate the inquiry. First, the change of circumstances must involve the child's circumstances rather than those of either or both parents. *Steen v. Steen*, 61 S.W.3d at 327; *Hoalcraft v. Smithson*, 19 S.W.3d at 829. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. *Turner v. Turner*, 776 S.W.2d 88, 90 (Tenn. Ct. App. 1988). Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. *Adelsperger v. Adelsperger*, 970 S.W.2d at 485. Fourth, the circumstances must affect the child's well-being in some material way. *Hoalcraft v. Smithson*, 19 S.W.3d at 829; *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn.Ct.App. 1993).

The person seeking to change an existing custody arrangement has the burden of demonstrating both that the child's circumstances have changed materially and that the best interests of the child require a change in the existing custody arrangement. *In re Bridges*, 63 S.W.3d 346, 348 (Tenn. Ct. App. 2001); *Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). The threshold question is whether there has been a material change in the child's circumstances. *Blair v. Badenhope*, ___ S.W.3d ___, ___, 2002 Tenn. LEXIS 192, at *35 (Tenn. May 3, 2002); *In re Bridges*, 63 S.W.3d at 348; *Placencia v. Placencia*, 48 S.W.3d 732, 736 (Tenn. Ct. App. 2000). If the person seeking the change of custody cannot demonstrate that the child's circumstances have changed in some material way, the trial court should not re-examine the comparative fitness of the parents, *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), or engage in a "best interests of the child" analysis. Rather, in the absence of proof of a material change in the child's circumstances, the trial court should simply decline to change custody. *Hoalcraft v. Smithson*, 19 S.W.3d at 828.

Appellate courts are reluctant to second-guess custody decisions when so much depends on the trial court's assessment of the witnesses' credibility. *Nelson v. Nelson*, 66 S.W.3d 896, 901

(Tenn. Ct. App. 2001); *Gaskill v. Gaskill*, 936 S.W.2d at 631. However, we will reverse or modify a trial court's custody decision if we conclude that the trial court's decision rests on an error of law or if we conclude that the evidence preponderates against the finding that there has been a material change in the child's circumstances or that the child's interests will be best served by changing an existing custody arrangement. *Steen v. Steen*, 61 S.W.3d at 328; *Placencia v. Placencia*, 3 S.W.3d 497, 499 (Tenn. Ct. App. 1999); *Adelsperger v. Adelsperger*, 970 S.W.2d at 485.

### III.

Mr. Yanusz argues on this appeal that the trial court erred by determining that there had been a material change in his son's circumstances because he and Ms. Taylor continued to cohabit as husband and wife following their divorce. Alternatively, he asserts that any change in the child's circumstances that may have occurred did not materially affect his son and that he continued to be comparatively more fit than Ms. Taylor to be the custodial parent.

We turn first to the threshold question regarding the change in the child's circumstances. We do not agree with Mr. Yanusz's assertion that the child's circumstances have not changed. As a general rule, parties go their separate ways after a divorce. They do not customarily continue to live together as husband and wife. Thus, when Mr. Yanusz and Ms. Taylor divorced in November 1998, it was reasonable for the trial court to expect that Mr. Yanusz would establish a separate home for himself and his son without Ms. Taylor. It would, therefore, have not been reasonable for the trial court to anticipate that Mr. Yanusz and Ms. Taylor would reconcile and resume living together. Accordingly, the parties' reconciliation amounted to a change of circumstances.

A much closer question is whether this change of circumstances materially affected the parties' child. While the record contains an abundance of evidence regarding the effects of the attempted reconciliation on Mr. Yanusz and Ms. Taylor, there is relatively little evidence regarding its effects on the parties' son. There is no evidence that either Mr. Yanusz or Ms. Taylor directed any of their anger or frustration toward their son.[7] What evidence there is depicts the child as happy, healthy, and adjusted. However, by living with his parents from February 1999 until March 2001, the boy must have witnessed and must have been affected by their deteriorating relationship. Therefore, we find that the parties' attempted reconciliation and their treatment of each other during the two years that they lived together following the divorce must have materially affected their son.

The parties' decision to attempt to reconcile for their son's benefit was well-motivated and, in retrospect, ill-advised. According to Ms. Taylor, it became evident within weeks after she moved back in with Mr. Yanusz that the breach in their relationship caused by her adultery would not be easily overcome. We have no doubt that Mr. Yanusz's somewhat justifiable suspicions about Ms. Taylor's fidelity caused him to act inappropriately during the parties' attempted reconciliation. However, Ms. Taylor is not without fault. She conceded that she was not a "battered woman" and

---

[7]It is quite obvious that Ms. Taylor's testimony focused chiefly on the way that Mr. Yanusz had treated her during their reconciliation. She discussed her son very little except to opine that "I don't think it's a good influence for him to see his father cussing me or any other person in front of him and putting his hand through walls and grabbing me around the throat."

that she had "brushed" Mr. Yanusz's face on one occasion. She also did not dispute that she could dish it out "about as good" as she could take it, even though she insisted that she never "physically harmed" Mr. Yanusz.

We do not condone or excuse either party's conduct during the reconciliation period. However, we conclude that the record does not support the trial court's conclusion that at the time of the August 27, 2001 hearing Mr. Yanusz's behavior was "escalating" or "dangerous." All the manifestations of inappropriate behavior that Ms. Taylor complained about at trial ceased with the parties' separation. In the absence of any evidence in the record of similar conduct by Mr. Yanusz after March 2001, the record more properly supports the conclusion that Mr. Yanusz's conduct was brought on by the stress of continuing to live with Ms. Taylor when he believed that she was again being unfaithful to him.[8] With this stress removed, there is no evidence that Mr. Yanusz is unable or unwilling to continue being his son's primary physical custodian.

Based on our review of the record, we have concluded that Ms. Taylor failed to carry her burden of demonstrating that, at the time of the August 2001 hearing, changing the joint custody arrangement the parties had agreed to in November 1998 was in their son's best interests. Accordingly, we conclude that the trial court was, in effect, punishing Mr. Yanusz for his conduct during the parties' attempted reconciliation. Without evidence that this conduct continued after the parties finally separated, the record simply does not support the trial court's conclusion that Mr. Yanusz's conduct, by the time of the August 2001 hearing, was escalating and violent enough to require a change in custody.

## IV.

We vacate the portion of the August 29, 2001 order awarding sole physical custody of the parties' son to Ms. Taylor. We remand the case to the trial court with directions to reinstate the joint custody arrangement embodied in the parties' marital dissolution agreement as appropriately modified in the trial court's discretion to fit the parties' existing circumstances. We also direct the trial court to set Ms. Taylor's child support obligation in accordance with the child support guidelines. We tax the costs of this appeal in equal proportions to Tracey L. Taylor and to John J. Yanusz and his surety for which execution, if necessary, may issue.

---

[8]This pressure is perhaps best illustrated by the following exchange between Mr. Yanusz and Ms. Taylor's lawyer:

Q: You didn't intend to stay with this woman. You ain't over it today and you ain't never even come close to being over the fact that you believe she had an affair and she's hurt you to the quick?

A: I don't believe. I know she's had an affair.

Q: That wasn't the question. Regardless of what you know, you ain't never got over it and you ain't going to, are you?

A: Oh, yeah, I'm over it now. I work with the guy she had the affair with now and have conversations with him.

Q: When did that start?

A: That just started the last couple of weeks. I started there in May and he was brung in in June, so I've been working there with him since June.

_____
WILLIAM C. KOCH, JR., JUDGE