IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2005 Session

## JOHN L. SMITH v. DEBORAH SMITH

**Appeal from the Chancery Court for Cheatham County**
**No. 11083     Leonard W. Martin, Judge**

**No. M2003-02259-COA-R3-CV - Filed January 23, 2006**

This appeal arises from a custody dispute involving an eleven-year-old boy. After the parties agreed to end their marriage, the father filed a complaint for divorce in November 2001 in the Chancery Court for Cheatham County. In addition to the complaint, the father filed a marital dissolution agreement and a parenting plan designating the mother as the primary residential parent. The child remained in the mother's custody until October 2002 when the trial court awarded the father temporary custody of the child. Following a hearing in July 2003, the trial court entered an order in September 2003 declaring the parties divorced and designating the father as the primary residential parent. The mother has appealed. Despite the father's conduct following the parties' separation, we have concluded that the trial court's decision to designate him as the child's primary residential parent does not fall outside the spectrum of rulings that might reasonably result from a correct application of the governing law to the facts established by the evidence in this case. Accordingly, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

John M. Cannon, Goodlettsville, Tennessee, for the appellant, Deborah Smith.

James Robin McKinney, Jr., Nashville, Tennessee, for the appellee, John L. Smith.

**OPINION**

**I.**

Deborah Moneymaker met John Lee Smith when she was approximately thirty years old and when he was forty-eight. She had been twice married and twice divorced and had one child from a previous marriage. Mr. Smith also had one child, and he told Ms. Moneymaker that he was already divorced from his first wife. This was untrue. However, Mr. Smith eventually divorced his first wife after he and Ms. Moneymaker became romantically involved and moved in together. On July 5, 1995, two years after the couple began living together, Ms. Moneymaker gave birth to their only

child, Johnathan Lee Smith. Mr. Smith and Ms. Moneymaker married two years later on September 19, 1997 and, shortly thereafter, moved from Kentucky to Joelton, Tennessee.

Ms. Smith[1] was primary care-giver for the parties' son and had even begun to home-school him. Mr. Smith was absent for long periods of time because of his employment with the Metropolitan Nashville Police Department. After his forced retirement in December 2000,[2] Mr. Smith purchased a "meat and three" called the Smokehouse Restaurant and Tavern. The parties' relationship became strained, and they separated in August 2001. Ms. Smith and the child moved to Kentucky to stay with friends.

In November 2001, the parties signed a marital dissolution agreement (MDA) and parenting plan drafted by a lawyer who was a friend of Mr. Smith.[3] These documents provided that the parties would have joint custody of their son and that they would alternate physical custody on a weekly basis throughout the year. They also required Mr. Smith to pay Ms. Smith $500 per month in child support and as reimbursement for her equity in the martial home.[4] Thereafter, Mr. Smith's lawyer filed the divorce complaint, along with the MDA and parenting plan, in the Chancery Court for Cheatham County.

The alternating weekly custody arrangement envisioned by the MDA and parenting plan proved to be short-lived. Although Ms. Smith prepared the child's weekly home-school lessons in advance for Mr. Smith, Mr. Smith consistently failed to review the materials with the child. When Ms. Smith informed him that the child's education could not continue in this manner, they mutually agreed to deviate from the custody arrangement contained in the MDA and parenting plan. Although

---

[1] Deborah Moneymaker changed her name to Deborah Moneymaker Smith following her marriage to Mr. Smith. At trial, she stated her full name as "Deborah Smith." Accordingly, for the remainder of the opinion, we will refer to her as "Ms. Smith."

[2] Mr. Smith had been a police officer with the Department for thirty years until he was forced to retire in December 2000 because of his involvement in an illegal gambling operation, his association with known criminals, his lack of truthfulness, and other violations of departmental rules and regulations. The Disciplinary Action statement issued by the Department and accepted by Mr. Smith described Mr. Smith's conduct as follows:

> It was determined that Sergeant Smith owned gambling equipment, having someone else "rob" poker machines for him. Incorporation papers were found relative to a partnership between Sergeant Smith and Sam Foster, who has prior criminal arrests and convictions involving gambling charges. Photographs were taken of Sam Foster, Linda Lemasters, and Sergeant Smith entering Sergeant Smith's police car. Sergeant Smith admitting working off-duty without secondary employment form approved. Sergeant Smith admitted consuming alcoholic beverages and then driving a police vehicle while on duty, and transporting persons with criminal backgrounds or unauthorized personnel in his police vehicle. Although he admitted most of his actions, there were aspects about which he was not truthful, where proof of involvement existed.

[3] Ms. Smith did not have counsel of her own.

[4] The parties agreed that Ms. Smith's equity in the marital home was worth $25,000 and that Mr. Smith would pay her $100 per month without interest until the debt was retired. The additional $400 per month was based on 21% of Mr. Smith's $1,800 monthly police pension.

the details of the new arrangement are not entirely clear, it appears that Ms. Smith essentially became the primary residential parent with Mr. Smith having frequent weekend visitation and extended visitation during the summer.

In January 2002, Mr. Smith informed Ms. Smith that their divorce was final even though it had never been presented to the court. With Mr. Smith's full knowledge and assistance, Ms. Smith and the parties' child moved from her temporary accommodations in Kentucky to Albany, Georgia to be closer to her family.[5] Ms. Smith rented a house next door to her parents' house, secured employment at a Winn Dixie grocery store, and continued to home-school the child through the end of the first grade. The child made several friends, enjoyed spending time with his grandparents and other relatives who lived nearby, and was actively involved in the community. In addition, the child continued to excel in his school work. In short, the child was flourishing in his new environment in Albany.

The child spent July 2002 in Joelton with Mr. Smith before returning to Albany in August where Ms. Smith had enrolled him in a community charter school for the second grade. For the first two weeks, the child was not adjusting well to the change from home-schooling to a more traditional school setting. He cried every morning, resisted going to school, and was upset while he was at school.

On August 23, 2002, Ms. Smith drove the child to Joelton for weekend visitation with his father. Exactly what happened next is a matter of some dispute. According to Ms. Smith, the child was upset and inconsolable when she picked him up on August 25, 2002. The child told her that Mr. Smith had told him that he did not have to return to the school in Albany if he did not want to and that he could live in Joelton with Mr. Smith and go to a different school there. After thirty to forty-five minutes of the child's nonstop crying, Ms. Smith pulled to the side of the road and called Mr. Smith. She told him the child was very upset and that the weekend visit might not have been long enough. She also suggested that it might be best for the child if he were allowed to spend a few extra days in Joelton even though this would interfere with his schooling in Albany. Mr. Smith agreed, and they met in Nashville to exchange the child with the understanding that Ms. Smith would return for him in a few days.

Mr. Smith's account differs significantly. According to Mr. Smith, he and Ms. Smith had reconciled and spent the entire weekend of August 23-25, 2002 together at the marital home in Joelton. Ms. Smith left with the child for Albany on Sunday, August 25, 2002 only because she needed a couple of weeks to put her affairs in order there before returning to live with him permanently in Joelton. However, Mr. Smith claims that he and Ms. Smith changed their plans when their son became upset on the drive back to Albany. According to Mr. Smith, they decided it would be better for the boy to remain with him in Joelton while Ms. Smith returned to Albany for two weeks.

---

[5]According to the record, Albany is an eight-hour drive from Joelton.

According to Mr. Smith, on Monday, August 26, 2002, he enrolled the child in second grade in a public school in Cheatham County. Mr. Smith testified that he saw no reason for the child to miss two weeks of school simply because Ms. Smith was down in Albany tying up loose ends.[6] Mr. Smith also claims that Ms. Smith told him later that week that she had changed her mind about reconciling with him and that she would be returning to Joelton to retrieve the child. Mr. Smith acknowledges that Ms. Smith never agreed to have the child enrolled in school in Cheatham County and that she never agreed that he could keep the child permanently in Joelton.

At this point, Mr. Smith and Ms. Smith's stories again converge. Ms. Smith returned to Joelton on Thursday, August 29, 2002. Unable to find Mr. Smith and the child, she went to the courthouse to obtain a copy of the divorce papers. There she was surprised to learn that the divorce had never been finalized. She immediately contacted an attorney to assist her in regaining physical possession of the child. However, on Friday, August 30, 2002, before Ms. Smith had a chance to act, Mr. Smith filed a motion in the trial court seeking an order of temporary possession and a restraining order to prevent Ms. Smith from taking the child back to Georgia.

The following week, Mr. Smith filed an affidavit in support of his motion. In it, Mr. Smith falsely swore that Ms. Smith had come back from Georgia on Friday, August 23, 2002 and simply left the child with him and told him that she wanted him to have custody. The affidavit failed to mention that Ms. Smith moved with the child to Georgia only after Mr. Smith falsely informed her that the divorce was final. Mr. Smith swore, without any basis whatsoever, that he was "in fear that substantial harm is likely to occur" if Ms. Smith is not enjoined from removing the child from his custody. Finally, Mr. Smith falsely accused Ms. Smith of breaking into the marital home and stealing certain personal items of his that he had acquired prior to the marriage. Ms. Smith subsequently filed her own motion for temporary custody, as well as an answer to the original divorce complaint. Ms. Smith accused Mr. Smith of deception and of attempting to perpetrate a fraud on the court to obtain custody of the child.

The trial court conducted a hearing on the petitions and, on October 28, 2002, entered an order granting Mr. Smith temporary custody of the child pending the final hearing. The trial court noted that the parties had agreed to this temporary arrangement but acknowledged that they did so based on the trial court's "recommendation to not uproot the child again until the final hearing." The trial court set the final hearing for November 27, 2002. Thus, as originally envisioned by both the parties and the trial court, the child would only have been in the father's custody for three months by the time of the final hearing.

As a result of a series of unexplained delays, the final hearing did not actually take place until July 28, 2003, almost one year after Mr. Smith wrongfully refused to return the child to Ms. Smith and then lied to the trial court to obtain temporary possession of the child. The testimony at the final hearing revealed few factual disputes relating to the issue of custody. The primary witnesses were

---

[6]The child's school records contradict Mr. Smith's account. They show that the child was not enrolled in school in Cheatham County until Wednesday, August 28, 2002 and that he did not actually attend school there until the following Thursday, September 5, 2002.

Mr. Smith and Ms. Smith. The trial court also interviewed the child, who had recently turned eight years old.[7] In addition, two of Ms. Smith's friends and her younger sister who lives in Albany also testified on the mother's behalf.

The evidence at the final hearing established that Mr. Smith had been extraordinarily uninvolved with the child while the parties lived together.[8] However, the evidence also showed that Mr. Smith had performed admirably as the child's caretaker ever since he obtained temporary custody in October 2002. The child was excelling in school and seemed to be quite happy in Joelton. Thus, the primary issue at the July 2003 proceeding was the manner in which Mr. Smith obtained temporary custody of the child and whether he was a good role model for the child.

At the conclusion of the hearing, the trial court indicated that it planned to award primary residential custody of the child to Mr. Smith with the mother having visitation the first weekend of every month and extended visitation during the summer and over school holidays. The court stated that it had considered the statutory factors, including the child's stated preference to live primarily with his father,[9] and explained its decision as follows:

> I've listened carefully to [the parents' testimony], what they do and where they live, how they react to the child. And I think according to the testimony and after talking to the child, I think he's very bright and he's doing extremely well where he is and he seems very happy and content with his relationship. He's doing well in school. He's doing fine. I don't think we could improve on it. I think he will be a happier child right where he is and I think he's being well cared for.

On September 15, 2003, the trial court entered a final order conforming to its statements at the conclusion of the final hearing. Ms. Smith appealed.

## II.
### THE STANDARD OF REVIEW

Custody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). Courts must

---

[7] A court reporter and the parties' attorneys were present for this interview.

[8] The undisputed evidence at trial showed that Mr. Smith's lack of involvement in performing caretaking functions for the child during the marriage was truly extreme. He refused to watch the child on even the most temporary basis so that Ms. Smith could run errands such as grocery shopping. As a result, during the course of the marriage, Ms. Smith left the child in Mr. Smith's care only twice. On the first occasion, she was gone for a day. When she returned, the child's diaper was dirty and he had not been fed. When Ms. Smith asked her husband why he had not fed the child, he replied that he did not realize that the child was hungry. The second time Ms. Smith attempted to leave the child in the father's care was equally unsuccessful. She left for what was supposed to be a three-day trip out of town but had to return early when Mr. Smith called her and said that he could not handle taking care of the child.

[9] The trial court noted that the child's preference is a factor to be considered but is not controlling.

strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993). The needs of the children are paramount, while the desires of the parents are secondary. *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986). Custody should never be used to punish or reward the parents, *Turner v. Turner*, 919 S .W.2d 340, 346 (Tenn. Ct. App. 1995); *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App. 1972), but rather should promote the children's best interests by placing them in an environment that will best serve their physical and emotional needs, *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983).

There are no hard and fast rules for determining which custody and visitation arrangement will best serve a child's needs. *Taylor v. Taylor*, 849 S.W.2d at 327; *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). The Tennessee General Assembly and the courts have identified the factors that trial courts should consider. Tenn. Code Ann. § 36-6-106(a) (2005); *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983).

Courts customarily devise initial custody and visitation arrangements by engaging in a comparative fitness analysis that requires them to determine which of the available custodians is comparatively more fit than the other. *In re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); *Bah v. Bah*, 668 S.W.2d at 666. This "comparative fitness" analysis does not measure the parents against the standard of perfection because the courts are pragmatic enough to understand that perfection in marriage and parenting is as evanescent as it is in life's other pursuits. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998). Rather, the analysis requires the courts to determine which of the parents, in light of their present circumstances, is comparatively more fit to assume and discharge the responsibilities of being a custodial parent.

Custody and visitation decisions often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters,[10] but they still must base their decisions on the proof and upon the appropriate application of the relevant principles of law. *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols*, 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992).

Trial courts necessarily have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn.

---

[10]Tenn. Code Ann. § 36-6-101(a)(2) (2005) vests the courts with "the widest discretion to order a custody arrangement that is in the best interest of the child."

1999); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998). It is not our role to "tweak [these decisions] . . . in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding custody or visitation should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d at 88.

## III.
### THE AWARD OF THE DIVORCE

Ms. Smith takes issue with the trial court's decision declaring the parties divorced in accordance with Tenn. Code Ann. § 36-4-129(b) (2005). She insists that she was entitled to a divorce in light of Mr. Smith's conduct during the marriage and after the parties separated. Tenn. Code Ann. § 36-4-129(b) provides that a trial court "may, upon stipulation to or proof of any ground for divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone." Mr. Smith and Ms. Smith both alleged in their pleadings that they should be granted a divorce on the ground of "[i]rreconcilable differences between the parties," Tenn. Code Ann. § 36-4-101(14), and the evidence presented at the final hearing amply supported the allegations of irreconcilable differences. Thus, under the express language of Tenn. Code Ann. § 36-4-129, the trial court had the authority to declare Mr. Smith and Ms. Smith divorced without assigning fault to either of them. Ms. Smith has presented no colorable argument to the contrary. Accordingly, we reject Ms. Smith's first argument.

## IV.
### PERMITTING THE PARTIES' CHILD TO TESTIFY

Ms. Smith also contends that the trial court erred by permitting the parties' eight-year-old child to testify at the final hearing. While a trial court is not required to consider the testimony of children under the age of twelve, it may exercise its discretion to permit a child under the age of twelve to state his or her custody preference. Tenn. Code Ann. § 36-6-106(a)(7)(B) (2005). At the conclusion of the final hearing, the trial court noted that it had considered the child's preference to live primarily with his father but then stated clearly that this factor was not controlling in its decision to award Mr. Smith primary residential custody of the child. Ms. Smith's argument that the trial court abused its discretion in allowing the child to testify or somehow accorded improper weight to the child's preference is wholly unsupported by the record. Accordingly, we reject Ms. Smith's second argument as well.

## V.
### THE TRIAL COURT'S RELIANCE ON THE CHILD'S CIRCUMSTANCES BETWEEN THE ENTRY OF THE TEMPORARY CUSTODY DECREE AND THE FINAL ORDER

Ms. Smith's third issue presents a more difficult question. She insists that the trial court placed too much weight on how well the child had fared during the year immediately prior to the trial

when he was in Mr. Smith's custody. She argues that relying on evidence from this period of time was improper because the order granting Mr. Smith temporary custody of the parties' son was the result of a fraud Mr. Smith perpetrated on the court. While we concur that Mr. Smith was less than honest and candid with the court when he obtained the temporary custody order, we have concluded that the appellate record does not support Ms. Smith's claim that the October 28, 2002 temporary custody order resulted from a fraud on the court.

The October 28, 2002 temporary custody order was not obtained ex parte. When the trial court issued this order, Ms. Smith had already warned the court that Mr. Smith was attempting to perpetrate a fraud on the court.[11] This issue was also discussed extensively at the September 30, 2002 hearing. In spite of Ms. Smith's claim, the trial court recommended at the conclusion of the hearing that the parties come to an agreement allowing the child to remain with Mr. Smith in Joelton to avoid uprooting him again prior to the final hearing. Thus, while Mr. Smith may have attempted to perpetrate a fraud on the court in order to obtain the order of temporary custody, the trial court was fully aware of Ms. Smith's allegations and nevertheless decided that it would be in the child's best interests to stay with Mr. Smith in Joelton until the final hearing.

Moreover, Ms. Smith cannot lay the blame for the extended delay between the September 30, 2002 hearing and the final hearing on July 28, 2003 solely at the feet of the trial court and Mr. Smith. After all, she acquiesced to the trial court's recommendation that the child remain with Mr. Smith in Joelton until the final hearing which was originally set for November 27, 2002. In addition, two weeks before the November 27, 2002 hearing, Ms. Smith retained new counsel and filed an agreed order to continue the final hearing indefinitely. Ms. Smith did not file a motion to set the final hearing until three months later on February 13, 2003, and in it, she requested that the motion to set the final hearing be heard six weeks later on March 26, 2003. Thus, while the record is unclear regarding all the reasons for the delay in bringing this case to a final hearing, it is clear that Ms. Smith was responsible, in whole or in part, for six months of the eleven-month delay.

This court has expressed concern about the effect that a temporary custody arrangement can have on a permanent custody decision. *Earls v. Earls*, 42 S.W.3d at 893 (Cottrell, J., concurring); *Adams v. Cooper*, No. M1999-02664-COA-R3-CV, 2000 WL 225573, at *6 (Tenn. Ct. App. Feb. 29, 2000) (No Tenn. R. App. P. 11 application filed); *Smithson v. Eatherly*, No. 01A01-9806-CV-00314, 1999 WL 548586, at *3 (Tenn. Ct. App. July 29, 1999) (No Tenn. R. App. P. 11 application filed); *King v. King*, No. 01A01-9110- PB-00370, 1992 WL 301303, at *2 (Tenn. Ct. App. Oct. 23, 1992) (No Tenn. R. App. P. 11 application filed). Although there may be sound policy reasons for avoiding placing too much weight on temporary custody arrangements that have been established after the breakdown of the parent's relationship but prior to the entry of a final custody order, the practical reality, given the critical importance of stability in child development, is that the longer a temporary custody arrangement remains in place, the more likely it is that the temporary arrangement will become permanent. *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *6 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed); *Bjork v. Bjork*, No.

---

[11]These allegations appeared in Ms. Smith's September 19, 2002 motion for temporary possession of the child and again in her answer and counterclaim filed on September 30, 2002.

01A01-9702-CV-00087, 1997 WL 653917, at *2-6 (Tenn. Ct. App. Oct. 22, 1997) (No Tenn. R. App. P. 11 application filed).[12]

---

[12]The American Law Institute describes this dilemma and the courts' responses to it as follows:

Most courts are reluctant to give positive weight to post-separation caretaking arrangements, since to do so would prejudice the parent who has not had temporary custody. *See, e.g.*, *In re Poling*, 594 N.E.2d 589 (Ohio 1992) (parents with temporary custody should not be able to "bootstrap" themselves into a "preferred custodial position"). Many states recognize the reality that, whatever the rule, "temporary-custody orders have a tendency to become permanent-custody orders." *See Odegard v. Odegard*, 259 N.W.2d 484, 485 (N.D. 1977); *King v. King*, No. 01-A-019110PB00370, 1992 WL 301303, at *2 (Tenn. Ct. App. Oct. 23, 1992) ("Temporary custody should . . . be used with caution because of its practical effect on permanent custody decisions. When permitted to continue over a long period, temporary custody creates a 'new status quo'. . . ."); *see also J.E.I. v. L.M.I.*, 314 S.E.2d 67, 72 (W. Va. 1984) (when parent who has acted as child's primary caretaker is unable to continue in that role and other parent assumes that role, court should allow a de novo hearing on custody when and if both parents are able to care for the child). *See also Marriage of Fields*, 671 N.E.2d 85 (Ill. App. Ct. 1996) (judge in permanent-custody hearing not bound by findings of judge who presided over hearing regarding temporary custody and visitation).

The longer the period between family breakdown and the actual trial, the more likely courts are to examine caretaking roles within that period itself. *See, e.g.*, *Sefkow v. Sefkow*, 427 N.W.2d 203, 212 (Minn. 1988) (although mother was primary caretaker during the marriage, custody award to father was upheld based on residence with father for substantial periods of time during the 3-1/2-year period of litigation and appeals over custody issue); *Paryzek v. Paryzek*, 776 P.2d 78 (Utah Ct. App. 1989) (reversing award to mother, even though she was determined to be the primary caretaker before the separation, based on fact that father had custody of child for the 2-1/2-year period prior to custody trial); *see also Swanston v. Swanston*, 502 N.W.2d 506, 508 (N.D. 1993) (when 2 years had passed between separation and trial, court considered only the period since separation); *Brooks v. Brooks*, 466 A.2d 152 (Pa. Super. Ct. 1983) (weighing 13-month period after parties' separation during which father had custody more heavily than 11-year period during which mother was the primary caretaker).

Even when nothing is presumed from a temporary arrangement, courts allow information about how the parties and the children react to the arrangement to be considered in determining what will serve the child's future interests. Thus, for example, when the parents' conduct during the post-separation period of shared temporary custody demonstrates that one parent is more flexible and willing to compromise on behalf of the children than the other, this factor is likely to be taken into account in fashioning the permanent caretaking arrangements. *See Marriage of McElroy*, 475 N.W.2d 221 (Iowa Ct. App. 1991) (based on disparities between parents' conduct, court determined that father would provide a more stable and suitable environment for the children). Negative responses to a particular residential arrangement are taken into account in some cases. *See, e.g.*, *Marriage of Kleist*, 538 N.W.2d 273 (Iowa 1995) (in affirming award of primary physical custody to the mother, court was "troubled" by father's lack of cooperative spirit in meeting terms of court's temporary custody order, as indicated by his refusal to vacate the marital residence; lengthy, disruptive visits with the 3-year-old child at her preschool on his nonvisitation days; and disputes that arose over his effort to take the child to his lawyer's office and over the child's medical treatment). Positive responses are also considered. *See, e.g.*, *Dowdy v. Dowdy*, 864 P.2d 439 (Wyo. 1993) (father given permanent custody of child, in part because the child had improved his grades while in his father's temporary custody); *Brandt v. Brandt*, 425 N.E.2d 1251 (Ill. App. Ct. 1981) (father given permanent custody after daughter improved under his temporary custody).

(continued...)

-9-

Ms. Smith argued strenuously in the trial court that Mr. Smith's established pattern of calculated deceit, including in the divorce action itself, rendered him such a poor role model for the child that he should not be allowed to have primary residential custody of the child. The trial court considered this argument but weighed it against the undisputed evidence that the child had been flourishing socially and educationally for almost a year while in his father's custody in Joelton. This court deplores Mr. Smith's conduct as revealed by the record on appeal. Nevertheless, in light of the undisputed evidence regarding how well the child has done in his care and the importance of continuity and stability in child custody cases, we cannot say that the trial court's decision to award primary residential custody of the child to Mr. Smith "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d at 88. Accordingly, we reluctantly affirm the judgment of the trial court.

## VI.

We affirm the order awarding primary residential custody of the child to John Lee Smith and deny his request for sanctions against Deborah Smith for filing a frivolous appeal. We remand the case to the trial court for whatever further proceedings consistent with this opinion may be required. We also tax the costs of this appeal in equal proportions to John Lee Smith and to Deborah Smith and her surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[12](...continued)
AM. LAW INST., PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.08 cmt. m (2002).