# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 24, 2012 Session

## ASHLEY RENEE REED v. MICHAEL EUGENE REED

**Appeal from the Circuit Court for Sumner County**
**No. 2009-CV-472     C. L. Rogers, Judge**

---

**No. M2011-00980-COA-R3-CV - Filed March 30, 2012**

---

Mother appeals from the trial court's post-divorce determination that a substantial and material change of circumstances occurred that warranted a modification of the parenting plan and the designation of Father as the primary residential parent of their children. Mother also appeals the termination of her alimony payments and an award of attorney's fees to Father. We affirm the finding that a substantial and material change of circumstance occurred and that it is in the best interests of the children that Father be the primary residential parent. We affirm the termination of alimony to Mother and the award of attorney's fees to Father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Cherie Cash-Rutledge, Murfreesboro, Tennessee, for the appellant, Ashley Renee Reed.

Karla C. Hewitt, Nashville, Tennessee, for the appellee, Michael Eugene Reed.

## OPINION

Ashley Renee Reed ("Mother") and Michael Eugene Reed ("Father") were divorced by Final Judgment of Divorce entered on March 16, 2010. Father was granted the divorce based upon Mother's adulterous affair with her paramour, Peter Demko. In spite of the affair, Mother was named the primary residential parent of the parties' two minor children; however, because of concerns raised by Father, Mother was enjoined from allowing Mr. Demko to be around the children pending further orders of the court. Furthermore, both parties were enjoined from having overnight guests of the opposite sex while the children

were present. Father was ordered to pay child support of $859 a month and transitional alimony of $500 per month for eighteen months, beginning in the month following the sale of the marital residence. No appeal was taken from the Final Judgment of Divorce.

On May 28, 2010, Father filed a Petition for Criminal Contempt and to Modify the Final Judgment of Divorce and Parenting Plan. In the Petition, Father alleged that a substantial and material change of circumstance had occurred that warranted a modification of the parenting plan naming him as the primary residential parent. The change of circumstance Father alleged was Mother's continued violation of the Final Judgment of Divorce by permitting her paramour to have contact with the minor children, by allowing her paramour to reside with her and the children, and by "acting in numerous ways not in the children's best interests."

On June 8, 2010, Father filed a Motion for Temporary Custody of the children alleging that Mother was in violation of the Final Decree of Judgment by allowing contact between her children and Mr. Demko. Father also alleged that Mr. Demko was residing with Mother and the children. Following an evidentiary hearing on June 16, the court granted Father's request for temporary custody pending a hearing on the petition, stating:

> The Court's order of March 16, 2010, has been violated regarding the children being in the presence of Mr. Demko. Further, the Court finds that the Mother still comes before the Court being dishonest about her relationship with Mr. Demko in contradiction of all the evidence to the contrary before this Court, and the Court, therefore, can only determine that there must be something about Mr. Demko that the Mother does not want the Court to know, and he may pose some sort of threat of harm to the minor children of this marriage. Had the mother been honest about her relationship with Mr. Demko during the divorce proceedings, this issue could have been determined then, thus avoiding the unnecessary cost and time of litigation. Therefore, the Court admonishes [Mother] that she should not be in violation of the Order regarding Mr. Demko again, or there will be very grave consequences pertaining to this family.

A full evidentiary hearing was held on the Petition to Modify the Parenting Plan on September 28, 2010, following which the court took the matter under advisement. In an order entered on November 22, 2010, the trial court found there had been a material change of circumstances and that it is in the best interests of the children for Father to be designated the primary residential parent and that the parents' responsibilities and obligations in the current parenting plan shall be swapped. As the court explained:

The Court finds that its order of March 16, 2010 and July 8, 2010 regarding the children not being in the presence of Mr. Peter Demko continues to be flagrantly violated by the Mother, Ashley Renee Reed. The Court admonished the Mother in its Order of June 16, 2010 that she should not be in violation of the Order regarding Mr. Demko again, or there would be very grave consequences pertaining to this family. Further one of the factors that the Court has to consider in the determination of a primary residential parent is the presence of third persons that will be in the children's lives or around them. All the Court knows about Mr. Demko is that he is not a U.S. Citizen and he is from Slovakia. Because of this limited knowledge about this man who has been proven to be in the presence of these minor children, the Court simply ordered that the Mother could not have the children around him until further hearing. However, Ms. Reed would not comply with this Order as has been supported by the proof. She spends a lot of energy hiding Mr. Demko. The Court can only determine that there must be something about Mr. Demko that the Mother does not want the Court to know. Further, the Court finds that the Mother, again, is not a credible witness in that she still persists in her testimony about having no relationship with Mr. Demko in contradiction of all the evidence to the contrary before this Court, including the evidence that Mr. Demko is actually living with her and the children.

The trial court ordered Mother to pay Father child support in the amount of $313 per month. The court also terminated Father's alimony obligation to Mother "based upon the proof that Mr. Demko is residing with Ms. Reed and that she is paying all expenses at her residence, the Court finding that the statutory presumption had not been rebutted." The trial court did not designate the order final, but stated that "Mother may come back with some proof and bring Peter Demko before the Court and file a case to modify the Court's ruling regarding primary residential parent. Additionally, the Father may file something with the Court to enter a final order." Father was also awarded a judgment of $6,322.50 against Mother for his attorney's fees. The issue of contempt was reserved.

Mother then filed a Tennessee Rule of Appellate Procedure Rule 9 motion for interlocutory appeal to challenge the above order and motion to stay that order. Father filed a Motion to Finalize Judgment. On March 31, 2011, the trial court denied Mother's motions, designated the previous judgment final, and awarded Father $4,885 in attorney's fees for defending Mother's motion for an interlocutory appeal and motion for stay. The trial court also declined to find Mother in criminal contempt although it found that she violated orders of the court as noted in its November 22, 2010 order. This appeal followed.

**Analysis**

On appeal, Mother raises several issues. First, Mother argues that the trial court erred in modifying the parenting schedule to designate Father as the primary residential parent. Second, Mother appeals the termination of transitional alimony. Last, Mother argues that the trial court erred in awarding attorney's fees to Father for the defense of her motion for an interlocutory appeal.

I. CHANGE IN DESIGNATION OF PRIMARY RESIDENTIAL PARENT

A. Standard of Review

Decisions involving parenting plans are among the most important decisions in a divorce case. *See Earls v. Earls*, 42 S.W.3d 877, 890-91 (Tenn. Ct. App. 2000). Courts must devise parenting plans that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997). Parenting decisions may not be used to punish parents, *see Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991). To the contrary, the interests of the parents are secondary to those of the children, *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986), the goal is to promote the best interests of the children by placing them in an environment that best serves their physical and emotional needs. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983).

When a petition to modify a parenting plan is presented, the threshold issue is whether there has been a material change in circumstances since the plan went into effect. *See Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (citing *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn.2002)). If a material change in circumstances has occurred, it must then be determined whether modification of the plan is in the best interest of the children. *Id.*; *Blair*, 77 S.W.3d at 150.

This court reviews custody and visitation decisions de novo with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Kendrick*, 90 S.W.3d at 569; *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990). Moreover, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *Parker v. Parker,* 986 S.W.2d 557, 563 (Tenn. 1999). This is because of the broad discretion given trial courts in matters of child custody, visitation and related issues. *Id.*; *see also Nelson v. Nelson,* 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001).

Custody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Accordingly, trial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Parker*, 986 S.W.2d at 563. A trial court's decision regarding custody or visitation will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

## B. Substantial and Material Change of Circumstance

When the issue is whether there should be a modification of the primary residential parent, Tennessee Code Annotated § 36–6–101(a)(2)(B) governs and it provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change of circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. *A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.*

*Id*. (emphasis added).

The overreaching fact that makes the determination of whether a material change of circumstances was established is that Mother repeatedly violated the court's orders.

The court expressly mandated in the parenting plan that Mr. Demko not be in the presence of the children. The court also enjoined both parents from having overnight guests of the opposite sex while the children were present. At the hearing, Mother testified that Mr. Demko had not been present with the children, but that was simply untrue, and based upon this the trial court correctly found that Mother was not a credible witness. Credible evidence clearly established that Mr. Demko was with the children on numerous occasions and he was with the children when Mother was not present, for example, when he drove one of the children places without her and that he spent the night with Mother when the children were present.

Janice Holt, a private investigator, testified that she witnessed Mr. Demko at the apartment complex where Mother and the children resided, that she saw his car parked

outside of the apartment complex late at night and early in the morning, and that she witnessed Mr. Demko taking one of the minor children in his car when Mother was not there. Photographs were admitted into evidence to support her testimony. She also made a record of his license plate tag number and a certified copy of his registration was admitted into evidence proving that the car in Mother's parking lot was Mr. Demko's. The record also contains the driver's license of Mr. Demko, which reveals that he listed his home address as Mother's address; the same address where the children reside when they are not with Father.

When Mother took the witness stand for the second time, the court questioned Mother about the mystery man in her life, Peter Demko, and why Mother failed to honor the only significant limitations the court placed upon her in the original parenting plan, to not allow him to be around the children and to not allow a person of the opposite sex to stay overnight when they were present. The relevant portion of that exchange follows:

> THE COURT: One of the factors that I have to look at in the very end is third persons that will be in their lives or around them. And all I heard was Peter Demko this. All I knew was he was not a U.S. citizen, he was from Slovakia, and you were lying about having an affair with him.
>
> So I simply said let's let you be primary residential parent [at the time of the divorce] and – until we have a further hearing and we figure out who this man is. And what do you do? You violate the one thing I told you not to. Didn't tell you not to do anything else. Just said don't have him around them until we can have a hearing. And you couldn't do it. Now I'm more upset and afraid what's going on for the two kids.
>
> I don't know how much you know about this man, but you spend a lot of energy hiding him. So it's not going to do you any good to come in here and give me these lame excuses about this and about that and think you're cute.
>
> You think I'm ever going to put you back in charge of these kids until I see Peter Demko?
>
> I had one reason only I needed to meet this man. You think I was going to turn them loose knowing he's going to be in their lives and I've never laid eyes on him? Is that doing my job I'm required to do? No. And I can't believe you.
>
> So now you want to sit here and give me a reason why I ought to just go back like it was. Ain't going to happen.
>
> I didn't fault you for anything. I found you guilty of adultery and washed right passed that. Left you in charge, except for one thing.
>
> I don't know this man. You're scaring me about lying about him. A non-U.S. citizen. I don't know if he's here legally. I don't know anything about him.

So until we know a little bit more about this man, don't have your kids around him. Real simple. But you couldn't do it.

Young lady, your actions are a result of what I'm fixing to do now.

[Father is] going to be the primary residential parent.

You're going to have the visitation that you've got now. And that's it.

THE WITNESS: May I have –

THE COURT: If you want to come back with Peter Demko and file a case modifying and let me be the primary, that's fine. We'll do it right.

I'm not doing this because of an allegation – and proof – that he's hanging around. It's just that you've had them in his presence. And I did not want that until I could figure him out. And that's why your order had one little niche still open, until the parties agreed or further order of the Court. But, oh, no, we can't do that.

So you made your bed. You're going to lay in it. And that's it.

I don't need to hear anything from [Mother].[1]

As noted above, a material change of circumstance does *not* require a showing of a substantial risk of harm to the child. Tenn. Code Ann. § 36–6–101(a)(2)(B). A material change of circumstance may be based upon one's failure to adhere to the parenting plan or other court order. *Id*. The record before this court established that Mother repeatedly violated the parenting plan by refusing to allow Father to pick up the children at Mother's apartment, *inter alia*, and by allowing Mr. Demko to be present with the children. As the trial court correctly determined, a material change of circumstance has been established; therefore, we affirm this determination.

## C. Best Interests of the Children

If the court determines that a material change in circumstances has occurred, the court must then determined whether modification of the parenting plan is in the best interest of the children. *Kendrick,* 90 S.W.3d at 570; *Blair,* 77 S.W.3d at 150. Mother argues that the trial

---

[1] We acknowledge that Mother also complains that she was prevented from completing her testimony after she was called to the witness stand the second time to respond to Father's testimony. As Mother asserts, the transcript of the evidence reveals, following the court's examination of Mother to ascertain why she repeatedly failed to comply with the court's orders and the court stating "I can't believe you," the court would not hear any further testimony from Mother. We find this was error, however, Mother did not make an objection and she did not request the opportunity to make an offer of proof. Thus, it was harmless error.

court failed to make a best interests analysis and that it is not in the best interests of the children to designate Father as the primary residential parent.

A best interests analysis requires the trial court to consider, *inter alia*, factors in Tennessee Code Annotated § 36-6-106(a) that are relevant to the case at hand. Further, the court's duty to consider relevant factors bearing on the children's best interests under Tennessee Code Annotated § 36-6-106(a) is mandatory, not permissive. *Schultz v. Fuller*, No. E2011-00874-COA-R3-CV, 2012 WL 11109, at *5-6 (Tenn. Ct. App. Jan. 4, 2012) (citing *Stovall v. The City of Memphis*, No. W2003-02036-COA-R3-CV, 2004 WL 1872896, at *3 (Tenn. Ct. App. Aug. 20, 2004)); *see Scogin v. Sorg*, No. M2007-01912-COA-R3-CV, 2009 WL 230233, at *9 (Tenn. Ct. App. Jan. 30, 2009).

The burden of proof is on the parent seeking a change in custody to establish that changing custody is in the best interest of the children. *Agee v. Agee*, No. W2007-00314-COA-R3-CV, 2008 WL 2065996, *5 (Tenn. Ct. App. May 16, 2008). Thus, Father carries the burden of proof in this case.

Unfortunately, the trial court made little more than a generic best interest conclusory finding; it did not articulate any findings regarding the statutory factors other than to generally address Mother's violations regarding Mr. Demko being in the presence of the children. The court did, however, note that one of the factors the court should consider in the determination of a primary residential parent is the presence of third persons that will be in the children's lives or around them. The court stated that, in spite of its many requests to examine Mr. Demko, all it knows about him is that he is not a U.S. Citizen, that he is from Slovakia, that the Court ordered Mother to not have the children around him until further hearing, that she failed to comply with this order, and that she spent a lot of energy hiding Mr. Demko. The trial court then concluded that there must be something about Mr. Demko that Mother does not want the court to know.

Although some of the above facts justify a further inquiry, they do not establish that the children would be at risk if in the presence of Mr. Demko. More importantly, the record fails to establish that the trial court considered other relevant factors bearing on the children's best interests, which is mandatory. *See* Tenn. Code Ann. § 36-6-106(a); *see also Schultz*, 2012 WL 11109, at *5-6; *Scogin*, 2009 WL 230233, at *9; *Stovall*, 2004 WL 1872896, at *3. Accordingly, we must examine the record and apply the relevant factors set out in Tennessee Code Annotated § 36-6-106(a) to the facts of this case or remand the case for the trial court analysis.[2]

---

[2]That is what the court did in *Scogin v. Sorg*, No. M2007-01912-COA-R3-CV, 2009 WL 230233

(continued...)

We have determined that the factors in subsections 1, 5, 6, 7 and 8 of Tennessee Code Annotated § 36-6-106(a) do not favor either parent, therefore, we shall not address those factors. We shall, however, address the remaining factors, starting with subsection 2.

(2)    The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver.

On the issue of dental care, Father testified that Mother failed to take the children to the dentist on at least three regularly scheduled visits and when he took the children they were in need of dental care. Specifically, he stated:

The kids have missed two almost three regularly – what would be regular scheduled dental visits even though my insurance covers them. And when I took – when I finally – when I was given primary residential status I took them to the dentist, and they ended up having several cavities that I took to get filled. Morgan still has to have one more filled.

As for education, the evidence is relatively close but for the fact Mother was responsible for the children being late for school on too many occasions, many more than when Father was responsible. The degree to which a parent has been the primary caregiver favors Mother.

After considering these factors, we find they slightly favor Father.

(3)    The importance of continuity in the children's lives and the length of time the children have lived in a stable, satisfactory environment.

Whether the children live in a satisfactory environment is at issue due to the mysterious circumstance surrounding Mr. Demko and why Mother has refused or failed to bring him to court for Father's attorney to question him in order for the trial court to determine whether Mr. Demko should be in the presence of the children. This is problematic for several reasons and, yet, Mother could have satisfied the court's concerns long ago by doing as the court has repeatedly requested, bring Mr. Demko to court. Father attempted to subpoena Mr. Demko but to no avail and Mother states that Mr. Demko refuses to come to

_____

[2](...continued)
(Tenn. Ct. App.  Jan. 30, 2009), because the only relevant finding made by the trial court was that "the Father's home is more stable and therefore, the Father should be the primary residential parent." *Id.* at *9.

court voluntarily. So why does he refuse to come to court and what, if anything, is he hiding? It may be nothing but it deserves inquiry, as the trial court stated, before he should be permitted around the children.

Because Mother has afforded Mr. Demko's frequent and unauthorized access to the children, and he remains a mystery, this factor weighs heavily in Father's favor.

(9)     The character and behavior of any other person who resides in or frequents the home of a parent and the person's interactions with the children.

This factor is in Father's favor for the reasons stated above concerning the mysterious Mr. Demko.

(10)    Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the children and both of the children's parents, consistent with the best interest of the children.

Another component of Mother's repeated violations of the parenting plan, specifically the requirement that Father pick up the children at Mother's apartment,[3] is that Mother refused to allow Father to come to her apartment. This is evident from the following:

A.      Since the divorce hearing, when school was still going in session, I would pick up the kids from school on – during my parenting times. When school let out for the summer, I was supposed to pick up the children at Ms. Reed's residence, per the parenting plan. I went – I went to pick up the kids from Ms. Reed's residence, and she let me know that I needed to come to the library.

Q.      How did she let you know?

A.      By text message.

Q.      And were you doing anything, you know, that would make her uncomfortable besides just being there to pick up your children?

A.      No. Just that – that very first time I was just going to pick up our kids.

Q.      Okay. So this was before you were accused of videotaping or camcording or taking a camera or pictures or anything. Correct?

A.      Yes, ma'am.

Q.      Was this the very first time after court?

---

[3]The transportation arrangements of the parenting plan specified that the parent who is to receive the children shall "pick the children up at the home of the other parent."

A. Yes, ma'am.

Q. So the order says that you're supposed to pick them up from each other's residence. Correct?

A. Yes, ma'am.

Q. So she told you what?

A. That I needed to pick them up from the library.

Q. And what did you tell her back?

A. I told her that the parenting plan said that I'm supposed to pick them up at her residence, and that was my plan.

Q. Was it easier for the children to be picked up at their residence?

A. I would think so. They could just relax and just be there at the apartment. You know, I have no interest in going into her apartment or causing any trouble or – really, as far as her relationship with Mr. Demko, apart from the conflict with the kids, I don't really have any interest in that. What I'm concerned about is the children and trying to take care of them and give them a stable environment.
And so I would think that it would be easier for them just to – just to hang out, and then I could text message her and the kids could come out or I could knock on the door and they come out. I'm not a person that's going to cause trouble just for the sake of causing trouble.

Q. Okay.

A. And then, you know, instead, they have to get into her vehicle, go over to the library. The times that I'm picking them up, the library is closed. It's Sunday at 8:00 – 6:00. I apologize. Sunday at 6:00 and Wednesday at 8:00. The library is closed.

Q. So they're just sitting there in the car?

A. Sometimes they would sit out on the bench during the summertime when it was very hot. And I don't know – back then I didn't know how early they were leaving to go over there. And I would expect in the wintertime it would be cold. And so it would be – it seems like it would be easier for the kids if they could just sort of hang out and relax until time for me to come.

Q. Has this persisted since the divorce proceeding February 2010?

A. Yes, ma'am.

Q. And so are there other places she requires you to go to pick up the children besides the library?

A. Throughout this whole process she's asked me to go to the park, to Walmart, to her work.[4]

Furthermore, when Father was asked whether Mother encouraged and fostered a healthy relationship with you and the children, he answered "no" and stated:

[E]ven in front of the children she'll sort of blow up. And there was – as I said, there was one time where she wanted to – she wanted to know something and she tried to push my door open and basically yelled at me through my apartment door after the kids had exited the apartment. But they were right there with her still. And they don't need to see that kind of thing.

A key factor in these cases is often each parent's desire and ability to encourage and facilitate a close and continuing relationship between the child and the other parent. *See Scogin v. Sorg*, 2009 WL 230233, at *13; *see also Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, *6 (Tenn. Ct. App. July 23, 2003). Father exhibited a willingness to work with Mother for the sake of the children's welfare while Mother exhibited the opposite. For the foregoing reasons, this factor is in Father's favor.

After considering the entire record and the foregoing statutory factors, we have concluded that the evidence does not preponderate against the trial court's finding that it is in the childrens' best interests for Father to be the primary residential parent. We, therefore, affirm the trial court on this issue.

## II. ALIMONY

Mother also contends the trial court erred in terminating Father's alimony obligation based upon the finding that Mother was cohabitating with her paramour. Father was ordered to pay Mother transitional alimony of $500 per month for a period of eighteen months. The trial court terminated Father's alimony obligation upon the finding that Mother and her paramour were residing together and that Mother was paying all the expenses at the residence. We affirm the trial court's termination of Father's alimony obligation.

Our Supreme Court addressed the standard of review for modifications of alimony in *Perry v. Perry,* 114 S.W.3d 465, 466-67 (Tenn. 2003):

---

[4]We acknowledge that the library was across the street from Mother's apartment, thus, it was not a significant inconvenience to Father. It was, however, an inconvenience to the children. Nevertheless, if Mother believed Father should not come to her apartment, she was required to obtain court approval. It was not her prerogative to change the parenting plan without court approval.

Our review of a trial court's decision regarding the modification of spousal support is limited: Because modification of a spousal support award is factually driven, a trial court's decision to modify its award is given wide latitude within the trial court's range of discretion. *See Watters v. Watters,* 22 S.W.3d 817, 821 (Tenn. Ct. App.1999). A trial court abuses its discretion only when it " 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.' " *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001) (quoting *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn.1999)). We shall presume the correctness of the trial court's factual findings so long as the evidence does not preponderate against them. *See* Tenn. R.App. P. 13(d); *Crabtree v. Crabtree,* 16 S.W.3d 356, 360 (Tenn.2000). However, we review the trial court's conclusions of law under a *de novo* standard with no presumption of correctness. *See Burlew v. Burlew,* 40 S.W.3d 465, 470 (Tenn.2001).

Tennessee Code Annotated § 36-5-121(g)(2)(C) (2010) provides that transitional alimony may not be modified unless:

A) The parties otherwise agree in an agreement incorporated into the initial decree of divorce or legal separation, or order of protection;

(B) The court otherwise orders in the initial decree of divorce, legal separation or order of protection; or

(C) The alimony recipient lives with a third person, in which case a rebuttable presumption is raised that:

> (i) The third person is contributing to the support of the alimony recipient and the alimony recipient does not need the amount of support previously awarded, and the court should suspend all or part of the alimony obligation of the former spouse; or
> (ii) The third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded and the court should suspend all or part of the alimony obligation of the former spouse.

We find that the trial court did not abuse its discretion in finding that the transitional alimony should be terminated. Father presented the testimony of a private investigator, who witnessed Mr. Demko, Mother's paramour, at the same apartment complex as Mother, Mr. Demko's car parked at Mother's apartment complex late at night and early in the morning,

and Mr. Demko exiting the apartment in the morning to drive one of the children to school. The private investigator also testified that Mr. Demko listed Mother's residence as his address on his driver's license registration. Mother testified that she paid for all of the rent and utilities at her apartment. Further, there was evidence presented that Mother paid for a cell phone, the number of which was listed as Mr. Demko's number for an emergency contact at her children's school. Based upon this evidence, the trial court did not abuse its discretion in terminating Mother's transitional alimony.

## III. ATTORNEY'S FEES

Lastly, Mother contends that the trial court erred in awarding Father his attorney's fees of $4,885.50 for defending Mother's Rule 9 Motion for an Interlocutory Appeal. Other than insisting that an interlocutory appeal was her only option, which is not entirely correct for she could have returned to court with Mr. Demko and promptly obtained a final order, she fails to cite any authority to explain why the court erred in awarding attorney fees to Father.

Tennessee Code Annotated § 36-5-103(c) provides that the parent to whom the custody of the children is awarded may recover from the other parent reasonable attorney fees incurred in regard to any action concerning the adjudication of the custody or the change of custody of any children of the parties, "both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court."

The trial court had the statutory authority to award attorney fees to Father and we find no abuse of discretion with the award. Accordingly, we affirm the award of attorney's fees to Father.

Father also seeks to recover the attorney's fees he incurred on appeal. Because he prevailed on all issues Father is entitled to recover his attorney's fees. On remand, the trial court shall award Father his attorney's fees to the extent they were reasonable and necessary to defend this appeal.

## IN CONCLUSION

The judgment of the trial court is affirmed and remanded for further proceedings in accordance with this opinion. The costs of appeal are assessed against the appellant, Ashley Renee Reed.

_____
FRANK G. CLEMENT, JR., JUDGE

-14-